[No. A049340. First Dist., Div. Five. Oct. 30, 1990.]

ERIC Z. SHAPIRA, Petitioner v.
THE SUPERIOR COURT OF SAN MATEO COUNTY,
Respondent;
GAYLE SYLVESTRI et al., Real Parties in Interest.

**COUNSEL**

Robert A. Harlem and Bryce C. Anderson for Petitioner.

No appearance for Respondent.

Hawkins, Blick & Fitzpatrick and Stephen L. Blick for Real Parties in Interest.

**OPINION**

**HANING, J.**—Petitioner is the defendant in an action for dental malpractice. Plaintiff/real party Gayle Sylvestri seeks substantial damages for alleged organic brain damage purportedly caused by petitioner's improper use of medication. Real party submitted to two defense examinations: A physical examination by a neurologist and a mental examination by a neuropsychologist. She refused to submit to an additional mental examination by a psychiatrist, on the ground that a defendant is permitted only one mental examination under Code of Civil Procedure section 2032.[1] The trial court denied petitioner's motion to compel the psychiatric examination, agreeing with real party that the statute limits a defendant to one mental examination. Petitioner seeks a writ of mandate to vacate the trial court's order. We issue the requested writ.

---

[1] Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Real party became petitioner's patient on February 5, 1982.[2] In a health history questionnaire, she indicated she had had a heart murmur for 17 years; petitioner was supposedly aware of this fact. Her chart in petitioner's office contains the following entry dated April 17, 1986: "Patient called to let us know she takes beta blockers Inderal."

On August 6, 1986, real party was in petitioner's office to have one tooth filled and another prepared for a crown. Although his records revealed both the heart murmur and the taking of Inderal, petitioner allegedly administered nitrous oxide, Xylocaine and the vasoconstrictor epinephrine without checking with real party's treating physicians. Real party contends the use of the medications was contraindicated.

Real party went into a *grand mal* seizure for 30 to 45 minutes; she flailed her arms and had difficulty breathing. As she was rushed to the hospital she briefly stopped breathing. She was hospitalized, initially in intensive care, until August 28, 1986. When discharged, she "evidenc[ed] a stroke-like state," and could only walk with a walker.

Prior to the incident real party was a person of above-average intelligence. Because of the claimed organic brain damage, real party now functions at a low intellectual level in the general range of borderline mental retardation. She is subject to severe depression and memory loss, and is incapable of running a household or being left alone for long periods of time. It appears from the record that real party is seeking $1.5 million in medical special damages.

A primary contested issue below is whether real party's disabilities are of organic or psychological origin. The medical experts differ in their conclusions. Several examining physicians, either treating physicians or expert witnesses for real party, have concluded that real party's disorder is at least partially functional (i.e., psychological) rather than the result of any organic brain damage. Six days after the incident, on August 12, 1986, real party's neurologist, Dr. Gravina, reported that much of her behavior did not appear to be caused by organic brain damage. On August 14, 1986, a psychologist, Dr. Reed, examined real party and concluded that some of her behavior "suggested generally inadequate cognitive functioning rather than a specific aphasic disorder." In the hospital discharge summary of August 28,

[2] Real party's unverified complaint makes only general allegations. The specific facts of this case are taken in large part from real party's verified opposition to the writ petition, which essentially tracks the statement of facts in her opposition to petitioner's motion to compel.

Although real party's husband is also a named plaintiff below and is named as a real party to the petition, the operative facts center around real party Gayle Sylvestri; we use the singular reference for the sake of simplicity.

1986, treating physicians spoke of a functional conversion reaction. Two physicians, one identified as a psychiatrist, indicated their opinions that there were no indications of organic brain damage.

Real party was examined on September 14, 1986, by Dr. Ginter, who concluded that her problems were psychological rather than organic. Dr. Ginter opined that real party's shuffling gait was functional and the result of a hysteria reaction. In November 1986 real party was rehospitalized after an apparent seizure; at the time of her admission hospital physicians were considering a psychological disorder, "conversion versus malingering." The possibility of a psychological disorder was similarly noted on the discharge summary.

In early 1987 real party was examined by a neurologist, Dr. Whaley, who found no objective, organic abnormalities and suggested much of her behavior was functional. In 1988 two examining physicians, one a psychiatrist, reported either malingering or clearly functional pseudoseizures.

In contrast to the foregoing, other treating physicians have concluded real party's symptoms are the result of organic brain damage. About a month or two after the incident, real party was examined by a neurologist, Dr. Fortuin, who concluded she suffered from hypoxic brain damage as a result of the anesthesia administered by petitioner. In a report dated October 27, 1987, Dr. Fortuin repeated this conclusion. On March 30, 1987, Dr. Keirnan, a clinical neuropsychologist, administered neuropsychological testing to real party and concluded the primary cause of real party's disabilities was the hypoxia suffered during the seizure in petitioner's office.

Faced with this conflicting medical opinion, petitioner requested a defense physical examination of real party by a neurologist, Dr. Newton. Because a defendant is entitled to one physical examination on demand (§ 2032, subd. (c)(2)), real party submitted to the examination on November 30, 1989. Dr. Newton concluded: "To my analysis, the diagnosis of organic encephalopathy is inaccurate, biologically implausible, unsubstantiated by reproducible objective data and inherently conflictual [sic] with numerous other aspects of this patient's situation. I am of the opinion that Ms. Sylvestri is a neurologically intact individual, presenting a potentially confusing and complex picture of psuedo-seizures and pseudo-dementia."

Dr. Newton reported in some detail how real party's symptoms were more consistent with a functional disability than an organic one. He also pointed out several medical reasons why the symptoms could not, in his opinion, have been caused by the drugs administered by petitioner or by any hypoxia during the seizure. He further concluded: "In summary, I am of

the opinion that this woman has a chronic emotional disturbance that is manifest, in part, through a process of somatization and pseudo-neurologic dysfunction. There are elements in her presentation that strongly suggest an interrelated process of simulated disability. Her family structure and interpersonal dynamics likely serve to actively re-enforce [*sic*] her 'disease.' While it is doubtful that she has the psychological sophistication or insight to benefit from counseling, *a formal psychiatric evaluation is called for in order to more fully understand a very complex picture.* The dental procedure has been but part of a passive staging on which has been played out a longstanding and pre-existing disturbance. I do not believe that there is any causal nexus between that procedure and Ms. Sylvestri's problems." (Italics added.)

Petitioner requested that real party submit to two mental examinations, one each by a clinical psychologist and a psychiatrist. Real party took the position that petitioner was entitled only to one mental examination. Petitioner scheduled an examination of real party by Dr. Munday, a neuropsychologist. Dr. Munday examined real party December 4, 1989, by administering standard psychometric tests such as I.Q., verbal learning, memory, visual organization, and word association. He formed the opinion that "the current clinical picture is not explainable on the basis of brain damage of any type." Like Dr. Newton, Dr. Munday noted various inconsistencies between real party's symptom history and organic dysfunction, including the worsening of real party's symptoms over time. Dr. Munday concluded: "It is clear to me that the symptoms at present are primarily on the basis of either functional (psychological) factors or on the basis of frank malingering. I don't have evidence that would lead me to the conclusion of malingering and at this point in time I think it is more likely that this is functional. I think a major question that has to be sorted out here is what is cause and what is effect. One wonders in this case whether or not the initial 'seizure' was not functional in origin, particularly given her subsequent history of 'fainting' when discussing dental procedures combined with the history predating this event of syncopal episodes, functional headaches and complaints of lips turning blue and occasional palpitations. [¶] . . . [¶] I plan to integrate my findings ultimately with Dr. Newton's neurological evaluation. *We are both in agreement that the patient should have the benefit of a full psychiatric evaluation to further clarify the patient's symptoms.*" (Italics added.)

Petitioner again requested that real party submit to a psychiatric evaluation; she refused. Petitioner then filed a motion to compel, arguing there was sufficient good cause (§ 2032, subd. (d)) based on the reports of Drs. Newton and Munday and their mutual recommendation of a psychiatric report. Petitioner noted that a neurologist's examination is limited to physi-

cal conditions, and a neuropsychologist only administers clinical psychometric testing; he argued that only a psychiatrist can synthesize the findings of the two other experts and evaluate the extent to which real party's behavior and test results are the result of emotional or psychiatric factors.[3] Petitioner also noted that real party had been examined by two treating psychiatrists, who would be free to testify at trial on her behalf.

■ Real party opposed the motion on the ground that section 2032 limited a defendant to only one mental examination, in this case the clinical psychological testing performed by Dr. Munday. The trial court denied the motion on the ground that section 2032 provided for only one mental examination. Petitioner contends the trial court misinterpreted the statute; we agree.

There is no question in this case that real party has placed her mental condition at issue and that petitioner is thus entitled to examine her mental condition. (See *Vinson* v. *Superior Court* (1987) 43 Cal.3d 833 [239 Cal.Rptr. 292, 740 P.2d 404]; § 2032, subd. (a).) The question is the *number* of mental examinations permitted by statute. Petitioner argues that section 2032 does not place a numerical limit on the number of mental examinations which may be ordered by a trial court on a showing of good cause. Petitioner is correct.

Nothing in the language of section 2032 limits the number of mental examinations. Subdivision (a) provides, in part, that "[a]ny party may obtain discovery, subject to the restrictions set forth in Section 2019, by means of a physical or mental examination of . . . a party to the action" where the physical or mental condition of that party is at issue. Various subdivisions describe the terms on which "a" physical or mental examination "conducted under this section" is to be carried out, but no language specifically limits to one the number of examinations. Such a limit cannot be implied from the use of the nonrestrictive singular article "a." In fact, the statutory language clearly contemplates a possible plurality of examinations.

Section 2032, subdivision (c)(2) provides that a defendant is entitled to one physical examination on demand. Section 2032, subdivision (d) provides, in part, for additional examinations on court order based on good cause: "If any party desires to obtain discovery by a physical examination other than that described in subdivision (c), or by a mental examination, the

---

[3] "In this circumstance, the capacity of the psychologist is to provide data for the psychiatrist to use. His [or her] position is analogous to that of an X-ray technician taking X-rays for a physician to examine or a medical technician taking a patient's blood pressure and reporting the findings to the doctor." (*Reuter* v. *Superior Court* (1979) 93 Cal.App.3d 332, 339 [155 Cal.Rptr. 525].)

party shall obtain leave of court . . . . [¶] The court shall grant a motion for a physical or mental examination only for good cause shown . . . ." Section 2032, subdivision (e) provides, in part, that "[i]n lieu of the procedures . . . specified in subdivisions (c) and (d), any physical or mental examination may be arranged by, and carried out under, a written agreement of the parties."

Nowhere does the Legislature specifically limit the number of available examinations, either mental or physical. The authoritative discovery commentators agree that multiple defense examinations are permitted on the necessary showing of good cause. (2 Civil Discovery Practice in Cal. (Cont.Ed.Bar 1988) § 10.13, p. 617 [multiple examinations "are not expressly restricted by [section] 2032" and are allowed for good cause]; Weil & Brown, Civil Procedure Before Trial (1990) §§ 8:1557, 8:1558, p. 81-14.) "Although Section 2032(a), which creates this discovery tool, refers to 'a' compulsory medical examination, this use of the singular article has never been taken to imply that only one such examination may be authorized. Moreover, the limitation of the use of the . . . 'demand' procedure to 'one' physical examination indicates that a party may obtain more than one by making a motion therefor under Section 2032(d)." (1 Hogan, Modern Cal. Discovery (4th ed. 1988) § 8.8, pp. 470-471, fns. omitted.)

Professor Hogan notes that analogous federal decisions have reached the same result, and have upheld multiple examinations by medical specialists in different fields pertinent to a plaintiff's injury. (1 Hogan, *op. cit. supra*, at pp. 471-472, citing inter alia *Marshall* v. *Peters* (S.D.Ohio 1962) 31 F.R.D. 238, 239 [orthopedist and cardiologist]; *Little* v. *Howey* (W.D.Mo. 1963) 32 F.R.D. 322, 323 [orthopedist and neurosurgeon].) He also cites a Delaware decision in which a trial court found good cause for five separate defense medical examinations—including those by a gynecologist, a neurologist, and a psychiatrist—of a plaintiff alleging injuries sustained from carbon disulphide poisoning. (*Bowing* v. *Delaware Rayon Co.* (1937) 38 Del. 206 [190 A. 567], cited at 1 Hogan, *op. cit. supra*, at p. 472.)

The commentators further agree that multiple examinations should not be ordered routinely; the good cause requirement will check the potential harassment of plaintiffs by repetitive examinations. (See, e.g., 1 Hogan, *op. cit. supra*, at p. 471.) One federal decision suggests that a court should require a stronger showing of good cause for a second examination than for the first. (*Vopelak* v. *Williams* (N.D.Ohio 1967) 42 F.R.D. 387, 389.) Moreover, section 2032 specifically subjects examinations to the protective provisions of section 2019, which provide for protective orders against discovery abuse.

The trial court's ruling that petitioner was entitled to only one mental examination is erroneous. Rather than precluding the motion, the trial court should have exercised its discretion to determine whether a second mental examination was authorized by good cause.[4] Accordingly, petitioner is entitled to a writ of mandate vacating the trial court's order denying the motion to compel.

We reach this conclusion after full briefing by the parties and after affording notice we might act by issuing a peremptory writ in the first instance. (See *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177-180 [203 Cal.Rptr. 626, 681 P.2d 893].)

Let a peremptory writ of mandate issue commanding respondent superior court to vacate its order denying petitioner's motion to compel and to conduct a hearing on the motion and the underlying question whether good cause supports the psychiatric examination. Although ample good cause appears from the facts as set forth above, good cause is a factual question which the trial court should resolve in the first instance. Petitioner shall recover costs.

Low, P. J., and King, J., concurred.

---

[4] Real party has suggested that when petitioner first contacted her regarding both psychological and psychiatric examinations, and when she informed petitioner he could have one or the other but not both, some form of agreement arose or an election was made that petitioner would obtain only the psychological evaluation. Real party, however, had unilaterally interpreted section 2032 as limiting the number of mental exams to one and simply refused to voluntarily submit to a second examination. Petitioner denied any agreement or election and indicated at oral argument below that given real party's ultimatum he scheduled Dr. Munday's exam on a voluntary basis knowing he could file a motion to compel the second examination on good cause.

If the trial court reasoned that real party offered a choice of a neurological or a psychiatric exam and petitioner made an election, the court erred because real party had no right to unilaterally force a choice which petitioner was not statutorily required to make.