[No. D012304. Fourth Dist., Div. One. July 9, 1992.]

PHILIP ARTZ KEES, Plaintiff and Appellant, v.
MEDICAL BOARD OF CALIFORNIA, Defendant and Respondent.

**[Opinion certified for partial publication.[1]]**

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts III through X.

1802

**COUNSEL**

Philip Artz Kees, in pro. per., for Plaintiff and Appellant.

Michael Kaye as Amicus Curiae on behalf of Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Alvin J. Korobkin, Assistant Attorney General, Barry D. Ladendorf and Michael P. Sipe, Deputy Attorneys General, for Defendant and Respondent.

**OPINION**

**TODD, Acting P. J.**—Philip Artz Kees, M.D., filed a petition for writ of mandate under Code of Civil Procedure section 1094.5 to review a decision

of the Division of Medical Quality of the Board of Medical Quality Assurance (the Board).[2] In the decision, the Board had revoked Kees's license to practice medicine but stayed the revocation and placed Kees on probation for 10 years subject to certain terms and conditions. The trial court denied the petition for writ of mandate. Kees appeals.

FACTS

Kees is a physician who was licensed to practice in this state on December 12, 1983. He was awarded a medical degree from the University of Alabama Medical School in 1973. From 1974 to 1982, Kees worked as consultant engineer and physician for North Carolina Medical-Legal Research Services, Inc., in Raleigh, North Carolina. In 1982, he started a residency in psychiatry at Loma Linda University; the residency was terminated after Kees contracted hepatitis, which led to diabetes. In December 1983, Kees joined the physician staff of Patton State Hospital, where he remained until March 20, 1984. Subsequently, he worked for Pacific Physicians, at various clinics in the Antelope Valley, and for the La Jolla Medical Clinic in the Los Angeles area (Hacienda Heights). In September 1985, Kees opened his own medical office in Palm Springs.

Kees has a long-standing history of alcoholism, dating from 1962. Starting in 1974, he maintained sobriety for 10 to 12 years.

On April 8, 1985, the Board issued an order to compel a psychiatric examination on Kees pursuant to section 820; Kees was served by certified mail on April 18, 1985.[3] Kees agreed to an examination, which was conducted on May 6, 1985, by John Sponsler, M.D., a psychiatrist.

Sponsler said the examination interview was difficult and very unusual. Kees was accompanied during the examination by his attorney, Andrew Gunn. Sponsler said the examination was characterized by secretiveness on the part of Kees, who concealed important facts, such as where he was currently working, and was deliberately vague about many others. Sponsler

---

[2]In 1990, the Board was renamed the "Medical Board of California." (Bus. & Prof. Code, §§ 2002, 2201, subd. (b).)

All subsequent statutory references are to the Business and Professions Code unless otherwise specified.

[3]The order read in part: "It Is Hereby Ordered pursuant to Business and Professions Code section 820 that: [¶] 1. Philip A. Kees, M.D., shall submit to a psychiatric examination to be conducted by a physician and surgeon specializing in psychiatry appointed and selected by the Division or its designee and to any further examinations or testing deemed necessary by said physician and surgeon to determine whether Dr. Kees is unable to practice medicine because his ability to practice is impaired due to mental illness, or physical illness affecting competency; . . ."

also said he was flabbergasted by Kees's statement that he did not know why he was being examined. Sponsler said Kees seemed very anxious throughout the interview. Sponsler also said Kees seemed "somewhat jovial and euphoric during what . . . should have been a serious and somewhat unpleasant interview for him." At the end of the examination, Sponsler tentatively believed Kees might have been suffering from a manic-depressive illness or some kind of paranoid disorder. However, the results of psychological testing Kees underwent on June 5, 1985, at Sponsler's request, were normal. Consequently, Sponsler was not certain what diagnostic label to apply to Kees and decided another examination or interview was called for. Sponsler prepared a report for the Board, dated July 10, 1985, in which he indicated Kees might be suffering from a remitting psychotic disorder such as polar disorder, manic type. After receiving the July 10, 1985, report by Sponsler, a Board investigator contacted Sponsler and asked him to review some documents, including reports concerning Kees's previous employment at Patton State Hospital. Subsequently, Sponsler prepared a second report for the Board, dated January 31, 1986, in which he narrowed his diagnosis of Kees to two possibilities: (1) paranoid personality disorder and (2) paranoia. Sponsler opined the first was the more likely diagnosis.

On February 20, 1986, Board investigator Ronald Cooke wrote to Kees directing him to contact Sponsler by March 3, 1986, for another psychiatric examination. Through correspondence by Kees's attorney and telephone conversations, an appointment was arranged for May 15, 1986. On the morning of May 15, 1986, Sponsler's office called Kees, who canceled the appointment because of transportation problems. The appointment was rescheduled for May 19, 1986. Kees canceled the May 19 appointment, giving no reason.

In June 1986, the Board asked Sponsler to review some additional documents, including police reports and declarations by two individuals who observed Kees in his Palm Springs office that spring and summer. Sponsler's review of these documents led him to believe the police officers and the individuals had observed Kees while he was having episodes of psychosis or drug intoxication or toxic metabolic syndrome. Based on all the information presented him, Sponsler reached the conclusion that on June 24, 1986, Kees "appeared to be in grave danger to himself and was clearly unable at that time to practice medicine without endangering the public."

On the morning of May 29, 1986, Palm Springs Police Sergeant Jon A. Clem went to Kees's medical offices to investigate an allegation of theft made by Kees against a police officer and a suspicious circumstances report. Clem found the office in disarray, with papers strewn about. Clem described

Kees as unkempt, wearing a dirty shirt and pants that were not ironed, and very slow in his actions and speech. Clem also observed Kees interacting in the main lobby of the office with a woman and a girl who had been in an examining room. As Kees asked questions and filled out a chart, the woman was preparing to pay, Clem said. Clem said after the patients left he asked Kees what happened the previous night, and Kees gave him a rambling statement in which he said (1) he was locked out of his building and had gone to a liquor store, (2) he was thrown out of the store and beaten up, (3) police arrived on the scene, including two or three officers who attempted unsuccessfully to assist him in getting inside his building, (4) the officers called a locksmith, who gained entry into the building, (5) the officers brought Kees a pair of his pants and (6) $500 was missing from the pants pocket. Clem did not believe Kees was telling the truth and "thought [Kees] was not in touch." When Clem returned to the police station he wrote a report and asked a colleague, Sergeant Steven Harrison, to go to Kees's office and interview him to get a "second opinion."

Harrison described Kees's office on the morning of May 30, 1986, as appearing as though it had been ransacked, with paper and trash on the floor, and medication bottles and boxes on the floor. Harrison described Kees's physical appearance as dirty with rumpled clothing. Harrison said Kees appeared to be very rundown and he acted as though he could have been intoxicated, but there was no indication of alcohol.

Doris Schofield read an advertisement in her church bulletin about Dr. Kees and made an appointment to see him for June 9, 1986, at 10 a.m. Schofield wanted to get a second opinion on her heart problem, which had been diagnosed as the heart skipping beats. When Schofield arrived for her appointment, another patient also was entering the office. Schofield noticed the office was in disarray with papers all over the floor; "[y]ou couldn't walk anywhere without walking on papers." Kees told Schofield and the other patient: "Don't mind the mess. I have ordered a new file cabinet, and it's okay. Just walk on the papers, or move them off the chair, and sit down." Kees told Schofield and the other patient to fill out medical history forms and then proceeded to confuse Schofield with the other patient. Kees told Schofield to go to the examining room, where he would perform an electrocardiogram (EKG). Kees performed an EKG while reading an instruction manual on how to operate the machine; after he managed to get the machine operating he started rambling about the lottery. After Schofield dressed, Kees unsuccessfully attempted to take her blood pressure. Kees did not use a stethoscope; instead he placed the gauge of the blood pressure machine on the inside of Schofield's arm. Unable to get a blood pressure reading, Kees expressed dissatisfaction with his equipment and switched to a different

instrument, with which he did obtain a blood pressure reading. After finishing with the blood pressure reading, Kees asked Schofield: "Oh, what can I do for you? Now, what was [sic] your complaints?" Schofield replied she had a problem with her heart skipping beats, and Kees replied that he would do an EKG. This time Kees was unable to operate the machine. When Schofield returned to the reception area, she observed Kees and the other patient discussing lab work. The husband of the other patient walked up to Kees, told him his wife was canceling the appointment and they left. Kees looked over at Schofield and said: "That's what they all do. They come in here, sit down, look at me and laugh, and get up and walk out. Ha, ha, to them too."

On June 10, 1986, about 11:30 a.m., James Miner, M.D., a psychiatrist, was walking on North Palm Canyon Drive in Palm Springs, when he noticed a young man coming from Kees's office building who was very pale, upset and looked as though he was in distress. Miner, who was concerned the young man was perhaps having a drug reaction, asked him if he were all right, and the young man replied he was upset with the condition of Kees's office, which he described as filthy and in shambles. Miner escorted the young man to the county mental health department, which was nearby, and then proceeded to Kees's office. Miner entered Kees's office, which he described as "a disheveled mess." As Miner walked through the office, asking "Is anybody here," Kees walked in from the outside. Kees was wearing rumpled, soiled clothes and had a musty, foul smelling breath. When Miner asked, "Is the doctor here," Kees responded, "I am Dr. Kees." Miner asked him if he was open for business, and Kees responded he was. Miner asked Kees if he was feeling all right and Kees responded, "Yes, of course." Miner said Kees then proceeded to ramble on about the heat, the office hours, his lack of health, and the emergencies that were coming and going. Miner said Kees's speech was slurred and his coordination was poor and he seemed tired and fatigued. Based on his approximately three-minute observation of Kees, Miner formed an opinion that Kees was an impaired physician who was either using medication or suffering from some type of alcoholism. Miner left the office and subsequently contacted the Board about his concerns.

On the morning of June 15, 1986, Officer Phillip Palmer of the Palm Springs Police Department, responding to a call, observed Kees leaning into a trash dumpster in a parking lot, removing items from the dumpster and eating them. Palmer said when he contacted Kees, Kees was totally unresponsive. Palmer described Kees as extremely dirty, with abrasions and scratches on his knees, hands and elbows. Palmer said he could not detect any odor of alcohol on Kees. Palmer took Kees into custody under Welfare and Institutions Code section 5150 as a gravely disabled person unable to

care for his own safety and transported Kees to Desert Hospital for a medical evaluation.

To institute a Board hearing on Kees's ability to practice medicine safely, on June 18, 1986, Kenneth Wagstaff, the Board's executive director, filed an accusation against Kees, alleging (1) his failure to comply with an order to undergo a psychiatric examination and (2) his impairment by reason of mental illness. The accusation, accusation No. D-3507, listed Kees's address as a post office box in Loma Linda, California.

On July 18, 1986, Margaret Lafko, a deputy attorney general representing the Board, contacted Kees by telephone at his Palm Springs office and informed him that her office would move ex parte for a temporary restraining order on July 22, 1986, in the Indio branch of the Superior Court of Riverside County. On July 22, 1986, the Board filed its petition for temporary restraining order pursuant to section 125.7 to restrain Kees from practicing medicine pending a hearing and decision by the Board on the accusation. On July 22, 1986, the superior court issued an order to show cause, setting a hearing for August 8, 1986, on a motion for a preliminary injunction. Lafko personally served Kees with a copy of the petition for a temporary restraining order, order to show cause, the accusation and other documents at his Palm Springs office at 6:45 p.m. on July 22, 1986.

Meanwhile, on July 25, 1986, Kees was admitted to Riverside Community Hospital for detoxification. On the evening of July 29, 1986, he was transferred to Rancho L'Abri, a residential drug treatment program in Dulzura, California, and admitted the following morning. He remained at Rancho L'Abri until October 1, 1986, when he was enrolled in a local recovery home and received outpatient treatment.

Kees did not appear at the August 8 hearing on the order to show cause, and the superior court in Indio issued a preliminary injunction barring him from practicing medicine during the pendency of the action and an administrative disciplinary hearing by the Board.

On September 26, 1986, the Board proceeded with its administrative hearing on accusation No. D-3507 by way of default in Kees's absence. On October 26, 1986, the administrative law judge, John A. Willd, submitted to the Board his proposed decision, which called for the revocation of Kees's medical license. The Board adopted the decision on December 11, 1986.

In November 1986, Kees, who by then was residing at Pathfinders in San Diego, obtained from the Attorney General various documents and first

actually became aware of the proceedings against him. Kees wrote to the Board, which treated his correspondence as a petition for reconsideration. On February 25, 1987, the Board granted the petition for reconsideration, setting aside the revocation order and remanding the matter for a new hearing. A de novo administrative hearing was conducted on June 22-23, 1987, in Palm Springs and on July 14-17, 1987, in San Diego, with Willd presiding. Kees appeared without counsel.

Testifying at the second administrative hearing as witnesses for the Board were Sponsler, Clem, Harrison, Palmer, Schofield, Miner, and Cooke. The Board also called Kees as a witness. Testifying for Kees were Dwayne Rogers, Donald Dougherty, Monica Vogelmann, William Wilson, David Lamb, Rabern Prante, Marjorie Askey, Carl Clark, M.D., Rose Jones and Walter Strybel, all of whom generally addressed Kees's recovery since July 1986 and his participation in Alcoholics Anonymous and similar activities. Also testifying as witness for Kees was John Milner, M.D., Kees's treating psychiatrist, who said Kees was abusing alcohol and drugs (codeine and Sinequan) while practicing in Palm Springs. Milner said since then Kees had progressed well in his recovery and with continued treatment and monitoring Kees was "approaching a time where we should be concerned about the re-entry phase" into the practice of medicine.

At the conclusion of the hearing on July 17, 1987, the record was kept open until September 1, 1987, to permit Kees to submit material concerning his current psychiatric condition and his status in the Board's diversion program. No additional material was submitted by Kees, and on October 7, 1987, Willd issued his decision, finding (1) Kees had failed to submit to a psychiatric examination in violation of section 820 and (2) Kees's ability to practice medicine safely is impaired because he is suffering from mental and physical illness.[4] On October 23, 1987, the Board adopted the decision, effective November 23, 1987.

## DISCUSSION

### I

Kees and amicus curiae contend the Board had no jurisdiction to prosecute a disciplinary action against him because he was a member of the Board's diversion program for impaired physicians. (See § 2340 et seq.; *B. W.* v. *Board of Medical Quality Assurance* (1985) 169 Cal.App.3d 219,

---

[4]The finding of physical illness as well as medical illness resulted from an amendment of the accusation offered by the Board's counsel at the end of testimony to conform the accusation to proof presented at the hearing.

231 [215 Cal.Rptr. 130] [under the legislation establishing the diversion program for impaired physicians (§ 2340 et seq.) "once a physician enters the . . . program . . . , the Board halts all action against the physician, whether it is investigatory or disciplinary."].)

The problem with this argument is the record does not contain evidence showing Kees was a formal member of the diversion program for impaired physicians under section 2340 et seq. Rather, what the record shows is that Kees was an informal, voluntary participant in the diversion program.[5]

In late 1983, when Kees sought employment with Patton State Hospital, he agreed to voluntarily attend the Board's diversion program as part of his employment agreement with the hospital. The only diversion contract contained in the record is one dated December 15, 1983, between Kees and Patton State Hospital officials in which Kees agreed his full-time permanent employment at Patton was conditioned on his five years' voluntary attendance in the diversion program and related conditions. During his cross-examination of Board Investigator Cooke at the administrative hearing, Kees, in referring to these documents, said he agreed to those conditions "[t]o get employment at Patton Hospital." Carl Clark, chief of staff at Patton, testified at the administrative hearing on behalf of Kees and said Kees's participation with the diversion program was a condition of his employment at Patton. Finally, we relate in part the testimony of Kees's witness, Dwayne Rogers, an independent contractor who facilitates the diversion program for impaired physicians in the San Diego area. Rogers, who met Kees on July 31, 1986, when Kees attended a diversion meeting along with doctors from Rancho L'Abri, testified as follows:

". . . Phil requested that I formulate a local diversion treatment plan for him to participate in the groups, and in doing that, I confirmed with the program office in Sacramento that he had come as a guest and wished to participate in the meetings as the diversion program refers to as an informal participant, which means he was interested in applying to the program on a formal [sic] basis and wished to participate in the program as much as he could, a full program, until those details were formalized with the program staff in Sacramento.

"Q. Did you use the term 'voluntary' in your description?

"A. No, I did not. I used the term 'informal.' Diversion doesn't use the term 'voluntary,' although Dr. Kees was referred by a treatment center which would be considered by diversion as a voluntary referral.

---

[5]The decision by the administrative law judge clearly recognized in paragraph VII that Kees "has participated as a volunteer member of the Diversion program off and on for several years."

"Q. You are stating that diversion doesn't use the term 'voluntary'?

"A. We use the term 'self referral' as opposed to board referral. Self referral is also in a sense, I suppose, voluntary, and self referral refers to a situation where a doctor is coming to us in other than a board referral situation. That is distinguished also from what we refer to as an informal participant, which means the physician is not a licensed physician participating in the diversion program as the procedures are laid out on a formal basis by way of the D.E.C. committees and having a state diversion treatment plan which is the formal application process.

"To explain, the diversion allows certain physicians and other health professionals to participate in the local groups at the discretion of the facilitator and the program manager and in a sense participate in the umbrella of the program and the groups even though that professional is not, has not, does not come under the physician program or has not completed formal application and been accepted to the diversion program as an official participant, I guess is what would describe it."

Moreover, the record is devoid of any evidence that Kees was a formal participant of the diversion program under the statutory requirements establishing the program (§ 2340 et seq.) and the rules and regulations governing those statutes (Cal. Code Regs., tit. 16, §§ 1357-1357.8). The statutory scheme for the diversion program for impaired physicians calls for diversion evaluation committees, which evaluate physicians who request participation in the program and establish a treatment program for participating physicians. (§§ 2341, subd.(b), 2350, 2352, 2354.) The record contains nothing to indicate any involvement by a diversion evaluation committee with Kees's voluntary participation in the program. (See § 2352, subd. (f).) To the contrary, the record contains declarations by Board officials, including Chet Pelton, the program manager for the Board's diversion program for impaired physicians, that state Kees was not a formal participant in the program and there was no formal diversion contract under the statutory scheme. Furthermore, Cooke, the Board investigator, also testified that in 1984, in the early part of his investigation, he asked diversion program officials if Kees was a formal or official member of diversion and was told that Kees was not.

Kees relies on a report prepared in July 1985 by Dr. John Lanier of Riverside Community Hospital, which states Pelton had contacted Lanier about placing Kees in the hospital for detoxification. As we understand Kees's argument, the fact that Pelton, the program manager for diversion, arranged or participated in Kees's admission to the hospital demonstrates

Kees was a formal member of the diversion program. This is not necessarily so. While Lanier's report indicates Pelton was familiar with Kees, it does not demonstrate that Kees was a formal member of diversion under the statutory scheme of section 2340 et seq.

In sum, other than Kees's repeated assertions over the years that he was a *formal* member of the diversion program for impaired physicians, the record is devoid of any evidence this was the case. In the absence of proof of such formal participation in the program, the Board was free to investigate him and institute disciplinary action. (Cf. *B. W. v. Board of Medical Quality Assurance, supra,* 169 Cal.App.3d at pp. 230-231.)[6]

II

Kees and amicus curiae attack the Board's order compelling him to undergo more than one psychiatric examination. They argue section 820 is unconstitutional as violative of the right to privacy,[7] and there was no good cause to compel a second psychiatric examination.

First, we shall consider whether section 820 is unconstitutional as violative of the right to privacy. Article I, section 1 of the California Constitution includes privacy among the inalienable rights of the people. The concept of privacy relates "to an enormously broad and diverse field" of personal actions and beliefs. (*White v. Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222].) The Supreme Court has also said that while the constitutional provision does not prohibit all invasions of individual privacy, it does require a "compelling interest" to justify such invasions. (*Id.* at p. 775.) In *Long Beach City Employees Assn. v. City of Long Beach* (1986) 41 Cal.3d 937, 943-944 [227 Cal.Rptr. 90, 719 P.2d 660], the

---

[6]*B. W. v. Board of Medical Quality Assurance, supra,* 169 Cal.App.3d at pages 230-231, discusses the diversion program for impaired physicians under section 2340 et seq. as an alternative to discipline in the context of a physician who engages in professional misconduct and is thereafter diverted from the disciplinary process. That is a distinctly different situation from what is presented in this case. If the type of informal participation Kees had with the rehabilitative aspects of the diversion program would effectively bar the Board from instituting disciplinary action for subsequent misconduct, then any physician could voluntarily join diversion and thereby immunize himself or herself from Board discipline for any future professional misconduct. Such a result would clearly not be in the public's interest and would contravene the legislative intent behind the diversion program for impaired physicians. (See § 2340 ["It is the intent of the Legislature that the Medical Board of California seek ways and means to identify and rehabilitate physicians and surgeons with impairment . . . so that physicians and surgeons so afflicted may be treated and returned to the practice of medicine in a manner which will not endanger the public health and safety."].)

[7]We note that recently section 820 was upheld in light of a constitutional attack that the statute violated due process rights. (*Alexander D. v. State Bd. of Dental Examiners* (1991) 231 Cal.App.3d 92 [282 Cal.Rptr. 201].)

Supreme Court observed that an individual's right to privacy encompasses mental privacy, including thoughts, emotions, expressions, and personality, noting "[i]f there is a quintessential zone of human privacy it is the mind." The Supreme Court said the test to determine whether a polygraph examination violated the constitutional right to privacy would involve (1) whether a compelling government interest in administering the examination had been shown and (2) whether this interest could be accomplished by less intrusive means. (*Id.* at p. 948, fn. 12.)

As amicus curiae concedes, the government has a compelling need in protecting the public against risk of harm by physicians who are so impaired they cannot practice medicine safely. (See also *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669, 679 [156 Cal.Rptr. 55].) Thus, the inquiry on whether section 820 is violative of the constitutional right of privacy should focus on whether the statute's grant of discretion to compel a mental examination is consistent with the requirement that the least intrusive means be used to satisfy the compelling government interest.

Section 820 authorizes the Board to order a licensed physician, whose ability to practice is impaired due to mental illness or physical illness affecting competency, to undergo a mental examination.[8] Section 820 does not require a mental examination in every such situation. Therefore, we interpret this provision as allowing a mental examination only if such an examination is the least intrusive means of determining a physician's mental condition. In adopting this interpretation, we are complying with the rule of statutory interpretation that construes a statute which may raise constitutional questions "in a manner that avoids *any* doubt about its validity." (*Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150], original italics; cf. *California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].)

In *Alexander D., supra,* 231 Cal.App.3d 92, 96-97, the Court of Appeal made the following pertinent observations:

"Section 820 authorizes the report of the examiners to be used as direct evidence in proceedings conducted pursuant to section 822, a statutory

---

[8]In full, section 820 reads: "Whenever it appears that any person holding a license, certificate or permit under this division or under any initiative act referred to in this division may be unable to practice his or her profession safely because the licentiate's ability to practice is impaired due to mental illness, or physical illness affecting competency, the licensing agency may order the licentiate to be examined by one or more physicians and surgeons or psychologists designated by the agency. The report of the examiners shall be made available to the licentiate and may be received as direct evidence in proceedings conducted pursuant to Section 822."

provision authorizing the Board to revoke or suspend the license or to impose probation if it determines the 'licentiate's ability to practice his or her profession safely is impaired.' These acts by the Board result from a formal determination requiring a specified adjudicatory process mandated by sections 826 and 1670 which require that the proceedings be conducted in accordance with the Administrative Procedure Act mandating full due process considerations. (Gov. Code, § 11500 et seq.) In addition, section 828 provides that if the licensing agency determines, after proceeding under section 820, that there is insufficient evidence to bring a formal adjudicatory action pursuant to section 822, then all agency records, including investigative and psychological reports, shall be kept confidential (and eventually destroyed) and are not subject to discovery or subpoena. In other words, the psychiatric examination is an investigatory tool, the results of which may be used by the Board to determine if formal adjudicatory proceedings will be brought." While *Alexander D.* dealt with due process—not privacy—rights, we find the above quoted comments, which highlight the investigatory nature of section 820 and the confidentiality aspects of the statutory scheme, relevant because they show this statutory scheme offers protections for the physician's privacy and thereby bolsters the constitutionality of section 820.

 The remaining issue is whether Kees's privacy rights were invaded by being ordered to undergo more than one psychiatric examination. Section 820 does not quantify how many mental examinations are allowed; it merely provides once it appears a physician's ability to practice is impaired due to mental illness or physical illness affecting competency, the Board has the discretion to order the physician "to be examined by one or more physicians and surgeons or psychologists designated by" the Board. (§ 820.)[9] However, the order to compel psychiatric examination on Kees issued by the Board on April 8, 1985, required Kees to submit to an initial psychiatric examination by a Board-designated psychiatrist and "to any further examinations or testing deemed necessary" by this psychiatrist.

Repetitive mental examinations are permissible if there is a showing of good cause. (*Shapira* v. *Superior Court* (1990) 224 Cal.App.3d 1249, 1255 [274 Cal.Rptr. 516] ["The authoritative discovery commentators agree that multiple defense examinations are permitted on the necessary showing of good cause."] and ["The commentators further agree that multiple examinations should not be ordered routinely; the good cause requirement will check the potential harassment of plaintiffs by repetitive examinations."].) Here,

---

[9]Amicus curiae unpersuasively argues section 820 is infirm because it fails to explicitly include procedural safeguards similar to those in Code of Civil Procedure section 2032, subdivision (d), that would protect against unjustified repetitive mental examinations. Subdivision (d) of Code of Civil Procedure section 2032 provides that during the course of civil discovery additional examinations are allowed only on court order based on "good cause."

there can be no doubt there was good cause to order Kees to undergo a psychiatric examination pursuant to section 820. The petition to compel psychiatric examination (1) outlined Kees's behavior between January and September 1984 in which he exercised questionable medical judgment and displayed extraordinary difficulty in dealing with people and (2) reported that a psychiatrist who had reviewed reports about Kees's behavior had determined that there was sufficient evidence to warrant psychiatric evaluation to determine if Kees is competent to practice medicine. Indeed, amicus curiae concedes here "[t]he prosecuting agents made an initial showing of good cause to justify a mental examination of Dr. Kees." Furthermore, Kees consented to the first examination by Sponsler.

But the question remains whether a showing of good cause to justify a second psychiatric examination was made. While a persuasive argument could be fashioned on this record that Kees's failure to cooperate with Sponsler during the first examination presented good cause, this would be akin to Monday-morning quarterbacking on our part. The point is that the enforcement officials of the Board, relying on the overbroad nature of the April 8, 1985, order to compel psychiatric examinations, never made a showing of good cause to justify a second psychiatric examination. In this sense, Kees's privacy rights were violated.[10] Therefore, the direction to undergo a second psychiatric examination was not valid, and Kees was not obligated to follow it. (*In re Berry* (1968) 68 Cal.2d 137, 149 [65 Cal.Rptr. 273, 436 P.2d 273] ["violation of [a] void order constitutes no punishable wrong."].) Accordingly, we conclude, as a matter of law, the finding Kees violated section 820 cannot stand.[11]

In light of our analysis in subsequent parts III through X of this opinion, particularly our determination there is substantial evidence to support the order, our finding of error here does not warrant a reversal.

### III-X*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

Benke, J., and Huffman, J., concurred.

A petition for a rehearing was denied August 3, 1992, and appellant's petition for review by the Supreme Court was denied September 23, 1992.

[10]We also note that in violation of section 820, Kees was not supplied with a copy of Sponsler's July 10, 1985, report.

[11]Amicus curiae and Kees have brought to our attention, among other authorities, a decision of the State Bar Court, *In the Matter of Respondent B.* (Review Dept. 1991) 1 Cal. State Bar Ct. Rptr. 424, which makes an analysis and reaches a conclusion on this issue similar to the analysis and conclusion we express in this part of the opinion. Needless to say, we are convinced of the rectitude of those views.

*See footnote 1, *ante*, page 1801.