[No. D024251. Fourth Dist., Div. One. Feb. 28, 1996.]

ROMAN CATHOLIC BISHOP OF SAN DIEGO et al., Petitioners, v. THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent; JANE D., a Minor, etc., Real Party in Interest.

1558

## Counsel

Sheppard, Mullin, Richter & Hampton, William V. Whelan, Callahan, McCune & Willis and Lynne Goodwin for Petitioners.

No appearance for Respondent.

Hurst & Hurst, Debra Hurst, Wolfe & McDonald and Deborah A. Wolfe for Real Party in Interest.

## Opinion

HUFFMAN, J.—Fifteen-year-old Jane D. (Jane) claims she was sexually abused by her parish priest. Jane sued the church, alleging it negligently hired, retained and supervised the priest because it should have known of his dangerous propensities as a sexual exploiter of children. The church seeks mandamus[1] after it unsuccessfully moved for summary judgment on the ground it had no prior knowledge or reason to know the priest was a risk to engage in a sexual relationship with a minor. We conclude the church established it had neither prior notice of the priest's unfitness nor a duty in the employment context to investigate the priest's sexual conduct. Consequently the church was entitled to summary judgment. We grant the petition.

### Factual and Procedural Background

Jane, through her guardian ad litem, filed a complaint for damages on October 18, 1994, naming the Roman Catholic Bishop of San Diego, the parish Church of the Most Precious Blood (together the church) and Reverend Emmanuel Omemaga[2] (Omemaga) as defendants. Jane alleged Omemaga was under the direct employ, supervision, agency and control of the church as an associate pastor. His employment duties "included providing for the spiritual and emotional needs of, and religious instruction for, parishioners, including providing for the proper supervision of minor parishioners entrusted to his care."

Jane alleged from August through September 1993 Omemaga "regularly and repeatedly engaged [her] in childhood sexual abuse, while she was

---

[1]Code of Civil Procedure section 437c, subdivision (*l*).

[2]Against Omemaga, Jane alleged causes of action for assault and battery, false imprisonment, intentional and negligent infliction of emotional distress, negligence, breach of fiduciary duty, fraud, intentional and negligent misrepresentation. We do not discuss the allegations which do not encompass the church. Although we take the facts as presented by the parties as true for the purpose of these proceedings, our discussion is not meant as a comment on whether Omemaga did or did not commit the alleged acts.

entrusted in his care, custody and control" including "oral copulation, forcible rape, rape with a foreign object, and taking lewd pictures." Jane claimed the church was responsible for supervising its priests, "overlooking the priests' activities, the priests' exercise of authority over parishioners and the priests' maintenance of the well-being of [the] parishioners." By holding itself out to be a safe environment for her to worship, Jane claimed the church "entered into an express and/or implied duty to properly supervise [her] and to provide [her] with a reasonably safe spiritual environment."

The church further assumed a duty to Jane by "holding Omemaga out to the public as a competent and trustworthy Roman Catholic Priest and counselor of high morals." Jane alleged the church breached its duty to her by exposing her to Omemaga "who was an unfit agent with dangerous propensities, and by not properly supervising [her]." She claimed the church "should reasonably have known of [Omemaga's] dangerous propensities as a child sexual exploiter" and "despite such knowledge, [the church] negligently retained and/or failed to supervise [Omemaga] in a position of trust and authority" where he was able to harm her. Jane said the church failed to provide reasonable supervision of Omemaga, failed to reasonably investigate him and to warn her.[3]

The church moved for summary judgment on the basis it was not negligent because it did not know and had no reason to suspect Omemaga posed any risk to parishioners prior to Jane's report. In essence, the church argued it had no civil duty to investigate its employees and the constitutional requirement separating church and state barred Jane's civil action for negligent hiring and supervision of a priest.

*Church's Evidence*

In support of the motion for summary judgment, Steven Callahan (Callahan) declared he is a priest and assistant to the bishop of San Diego. Callahan received a telephone call from Jane's mother on October 5, 1993, to the effect "something was going on between [Jane] and a priest." Callahan met with Jane's mother the following day. Jane's mother showed Callahan sexually explicit letters from Jane addressed to Omemaga. Callahan said until that day, no one in the church had received any report of misconduct or wrongdoing by Omemaga.

Callahan and the bishop met with Omemaga on October 8, 1993. Callahan said Omemaga admitted to sexual misconduct with Jane, but denied he had

---

[3]Jane also claimed the church negligently failed to notify police of Omemaga's whereabouts, allowing him to flee to the Philippines and the church was vicariously liable for Omemaga's acts. Those causes of action were disposed of by demurrer.

ever been involved with other minors. Omemaga said he did have one affair with an adult woman in San Diego and two women in the Philippines where he was incardinated. Callahan declared that was the first knowledge anyone in the church had of Omemaga's affairs.

Dionisio Macalintal (Macalintal) declared he was a priest assigned to St. Mary's parish in July 1991. He shared a residence with Omemaga until the end of 1991. Macalintal "never saw any sign that Omemaga had any problems with his celibacy" or had pornographic magazines, or that Omemaga paid particular attention to any girls in the parish. Macalintal never received any complaints about Omemaga.

Eugene Fischer (Fischer) declared he was the pastor of Church of the Most Precious Blood from July 1984 until February 1993. The parish does not have a parochial elementary or secondary school. Fischer and Omemaga shared the priests' residence from November 1991 through February 1993. Fischer "never saw any signs Omemaga had any problems with his celibacy." Girls acted as altar servers and lectors for the parish. Fischer never received complaints about Omemaga and "never had any reason to suspect that he had or would engage in sexual conduct with anyone, whether an adult or a minor." After "the news reports broke" about Omemaga, no one came to Fischer "with an account of any impropriety on Omemaga's part."

Neal Dolan (Dolan) declared he was the pastor of Our Lady of Perpetual Help Catholic Church where Omemaga lived in residence from September 1, 1993, through October 8, 1993. Similar to the other declarants, Dolan said he never received any complaints about Omemaga or saw any indication Omemaga had "problems with his celibacy."

Michel Gagnon (Gagnon) declared he was the pastor of Mission San Luis Rey Parish. In 1990, Omemaga visited the parish while on vacation from the Philippines. Gagnon requested Omemaga be permitted to practice ministry at the mission to benefit the Filipino community. Omemaga received permission from both the Filipino archbishop and the San Diego bishop. From October 1990 through November 1991, Omemaga lived and worked at the mission. Gagnon "never became aware of any facts which called for [Omemaga's] discipline" or that Omemaga "had any problems with his promise of chastity as a priest."

Daniel Dillabough (Dillabough) declared he is a priest and chancellor for the San Diego diocese. Dillabough has the responsibility for "personnel issues related to priests" in the diocese. Dillabough explained "[i]ncardination establishes that ecclesiastical superior who, subject only to the Pope, is

ultimately responsible for the supervision of a cleric. It refers to an institution (for example, a diocese, archdiocese, or religious institute) rather than an individual person." He also stated, "Under canon law, a priest who has faculties and is in good standing in his own diocese or community, is presumed qualified for ministry." A letter of permission from one's ecclesiastical superior serves as confirmation the priest is in good standing in his own diocese.

Omemaga provided Dillabough with a resumé of his credentials reflecting he was qualified to act as a Catholic priest. Gagnon told Dillabough that Omemaga had served the parish well during his visit. Bishop Gordoncillo of the Philippines wrote to Dillabough on October 12, 1990, granting Omemaga one year to pursue ministry in San Diego. Dillabough declared it was his "normal practice, when a priest has served within the diocese before and is known within the diocese, and no problems are known about the priest" he does no "further investigation." Dillabough said Omemaga was assigned from parish to parish for "routine administrative reasons" and until Jane's mother made her report to Callahan, no one in the diocese had knowledge Omemaga would "engage in sexual misconduct with anyone, much less with a minor."

Edward Peters (Peters) stated he has a doctoral degree in canon law and is the director of the office for canonical affairs for the San Diego diocese. Peters declared "one of the grave canonical obligations which a man must undertake in order to become a priest is the commitment to celibacy . . . . Because Omemaga was ordained a Catholic priest in the Philippines before coming to San Diego, there was no duty on the part of the Diocese of San Diego to screen or test him for matters relating to sexuality, unless and until a sexual problem manifested itself. Under canon law, priests, like the rest of the faithful, have a right to privacy. . . . While a pastor of a parish is responsible for coordinating the religious activities of associate pastors, the pastor has no right or duty under church law to search the rooms of associate pastors or to put them under surveillance, either during their free time or during the associate pastor's parish related activities." Peters detailed the administrative and penal processes the bishop may follow under canon law to punish a priest for sexual misconduct.

The church lodged copies of Omemaga's resumé, various letters relating to Omemaga's permission to work in San Diego, police reports of the criminal investigation and the criminal complaint filed against Omemaga.

*Jane's Evidence*

In opposition to the motion for summary judgment, Jane argued the church undertook a duty to investigate Omemaga before hiring him and thus

was obligated to discharge that duty with due care. Jane claimed there was a "custom and practice within a diocese that an extensive investigation is to be undertaken to ensure a priest's fitness prior to hiring him." She pointed to Dillabough's declaration stating Omemaga needed to provide documents attesting to his ordination and good standing in his own diocese in the Philippines. Jane claimed the church's investigation was negligent because it was limited to an "unquestioned and unauthenticated letter of permission, an unsubstantiated belief that Omemaga was a priest in good standing, and a report that Omemaga was popular with some parishioners."

Jane submitted portions of Dillabough's deposition in which he testified it was the church's policy to order a priest to undergo a "full battery of psychological review" upon notice of sexual misconduct. Jane also submitted Bishop Robert Brom's (Brom) response to interrogatories stating: "[D]epending on whether a priest is new to the Diocese or whether he is known within the Diocese, the Chancellor of the Diocese may ask priests seeking to perform ministry within the Diocese whether they have any past or present problems with their celibacy, and whether anyone has ever made a claim of sexual misconduct against them." Jane lodged portions of Brom's deposition stating the diocese screens candidates for the priesthood by psychological examinations to "weed out" potential pedophiles or ephebophiles.[4]

Thomas Doyle (Doyle) declared he is a priest, holds a pontifical doctorate in canon law and is an expert in the field of sexual abuse of children by clergy. Doyle stated candidates for the priesthood must have the "appropriate" qualities, including "good moral character and freedom from any psychological impediments such as sexual disorders." A host bishop may grant faculties to a visiting priest and is directly responsible for the visiting priest's actions in the diocese. Doyle said "[i]n common practice, before a bishop can accept a priest from another diocese, for incardination or official attachment into his own diocese, he must first have documentation attesting to the priest's life, morals and studies." Although there are no detailed guidelines how a priest demonstrates his fitness, "it is expected that a host bishop make specific inquiries as to the priest's background, his work record, and his character." Although bishops "do not ordinarily presume that priests in general will act out sexually in an inappropriate or even illegal manner, this presumption has been somewhat weakened by the events of the past few years." Doyle expected bishops to be "much more careful and even scrupulous when investigating the qualifications of priests who will work in their dioceses."

---

[4] An ephebus is a youth of ancient Greece, 18 or 19 years old, in training for full citizenship. (Webster's New Collegiate Dict. (9th ed. 1986) p. 417.)

*Ruling*

The court denied the church's motion for summary judgment, concluding a triable issue existed whether the church breached its duty of care "to discover Omemaga's unfitness as an employee," citing *Evan F.* v. *Hughson United Methodist Church* (1992) 8 Cal.App.4th 828 [10 Cal.Rptr.2d 748], and *Underwriters Ins. Co.* v. *Purdie* (1983) 145 Cal.App.3d 57 [193 Cal.Rptr. 248]. The court stated: "[B]ut for this breach, Omemaga may have never been hired. Accordingly, there are material questions of fact whether [the church] breached a duty undertaken to ensure non-negligent hiring and whether such breach was a proximate cause of [Jane's] claimed injuries. Additionally, since the 11th cause of action raises issues of negligent supervision of the minor and also incorporates negligent hiring, summary adjudication cannot be granted as the whole cause of action cannot be disposed of . . . ."[5]

This petition followed. We issued an order to show cause and stayed proceedings on November 1, 1995.

## DISCUSSION

■ A tort involves a violation of a *legal* duty, imposed by statute, contract or otherwise, owed by the defendant to the person injured. Without such a duty, any injury is an injury without wrong. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 6, p. 61.) A person is ordinarily not liable for the actions of another and is under no duty to protect another from harm, in the absence of a special relationship of custody or control. (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 293 [253 Cal.Rptr. 97, 763 P.2d 948].) Where, as here, a "complaint alleges injuries resulting from the *criminal acts of third persons* . . . 'the common law, reluctant to impose liability for nonfeasance, generally does not impose a duty upon a defendant to control the conduct of another [citations], or to warn of such conduct [citations], unless the defendant stands in some *special relationship* either to the person whose conduct needs to be controlled, or to the foreseeable victim of such conduct. [Citations.]' " (*Rodriguez* v. *Inglewood Unified School Dist.* (1986) 186 Cal.App.3d 707, 712 [230 Cal.Rptr. 823].)

*Negligent Hiring*

■ An employer may be liable to a third person for the employer's negligence in hiring or retaining an employee who is incompetent or unfit.

---

[5]The court also granted Jane's objections to the church's evidence on parish members' reactions to the alleged rape, and denied Jane's objections to evidence of her purported sexual conduct not involving Omemaga. Neither party addresses the evidentiary ruling on review.

(*Underwriters Ins. Co.* v. *Purdie, supra,* 145 Cal.App.3d 57, 69.) The rule of direct employer liability under the Restatement Second of Agency section 213 is: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless . . . [¶] . . . [¶] (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others . . . ." As explained in comment d: "The principal may be negligent because he has reason to know that the . . . agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him. If the dangerous quality of the agent causes harm, the principal may be liable under the rule that one initiating conduct having an undue tendency to cause harm is liable therefor. . . . [¶] . . . An agent . . . may be incompetent because of his reckless or vicious disposition, and if a principal, without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. . . . [¶] One who employs another to act for him is not liable . . . merely because the one employed is incompetent, vicious, or careless. If liability results it is because, under the circumstances, the employer has not taken the care which a prudent man would take in selecting the person for the business in hand. . . . [¶] Liability results . . . not because of the relation of the parties, *but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment. . . .*" (Rest.2d Agency, *supra,* § 213, com. d., italics added.)

 Here, the harm Jane claims she suffered was criminal sexual abuse by Omemaga.[6] There is nothing in the record to indicate Omemaga had a criminal history or had been previously implicated in sexual abuse of a minor. Thus the church could not have had antecedent knowledge of Omemaga's purported criminal dangerousness. Moreover Jane does not dispute the church had no actual knowledge of Omemaga's sexual activity with Jane or anyone else until it heard Jane's mother's report and Omemaga's purported admissions.

Jane claims the church was negligent in failing to discover Omemaga's unfitness prior to hiring him, relying on *Evan F.* v. *Hughson United Methodist Church, supra,* 8 Cal.App.4th 828 (*Evan F.*) In *Evan F.,* 13-year-old Evan was molested in 1985 by Murphy, the pastor of the local Methodist congregation. Ten years before, Murphy had agreed with the larger church

---

[6]The criminal complaint lists 41 counts, primarily consisting of lewd acts upon a minor, penetration by foreign object, oral copulation, unlawful sexual intercourse, forcible rape, sodomy and employment of a minor to perform prohibited acts.

conference to "step down" after several adolescent males complained he molested them. (*Id.* at p. 832.) After working as a counselor at a secular high school, Murphy applied and was hired by the local congregation in 1977 to work as its youth director. In 1982 he applied for the position of pastor of the same congregation.

At the time of his selection as pastor, the larger church conference not only knew of the 1970 molestations, but also that Murphy had recently been fired by the high school for "inappropriate behavior with an adolescent male." (*Evan F.*, *supra*, 8 Cal.App.4th at p. 832.) The conference further knew Murphy wanted reinstatement to the ministry only if he were appointed to the particular local congregation. The local congregation knew, at the very least, that there was "some difficulty" with Murphy's reinstatement. (*Id.* at p. 833.)

On appeal, the court reversed a grant of summary judgment, concluding Evan could state a cause of action against the local congregation for negligent hiring for its failure to investigate or make any inquiry regarding Murphy's fitness to serve as pastor.[7] Unlike in *Evan F.* where facts encompassed the particular risk of harm if Murphy were employed, here there were no facts showing an undue risk of harm that Omemaga would commit criminal child sexual abuse if he were employed by the church.[8]

Jane next argues the church was negligent in hiring Omemaga because, as part of its voluntarily screening process, it failed to "ask[] him whether he had problems with his vows of celibacy . . . ." Jane posits if Omemaga had been asked, Omemaga "would have admitted that he had two sexual relationships in the Philippines and one here in San Diego with a parishioner. . . . Undoubtedly, armed with this knowledge, any reasonable employer would have done an even more extensive investigation of Omemaga and most certainly would not have entrusted the care of minor girls to him without very close supervision." She contends Omemaga would then not have "been put in a position where he could repeatedly rape [her]."

Even if the church had learned of Omemaga's prior sexual affairs with adults, it is illogical to conclude the church should have anticipated

[7]Both the local congregation and the larger church conference were named defendants and the conference participated in Murphy's selection; however, the opinion is unclear whether Evan was also allowed to state a cause of action against the conference. (*Evan F.*, *supra*, 8 Cal.App.4th at p. 843.)

[8]Although she complains the church should have authenticated Omemaga's credentials and documents from the Philippines, Jane has failed to show authentication would have revealed any facts relating to risk of criminal sexual assault.

Omemaga would commit sexual crimes on a minor. More important, the legal duty of inquiry Jane seeks to impose on the church as an employer would violate the employee's privacy rights. Privacy is a fundamental liberty implicitly guaranteed by the federal Constitution (see *Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484-486 [14 L.Ed.2d 510, 514-516, 85 S.Ct. 1678]) and is explicitly guaranteed under the California Constitution as an inalienable right. (Cal. Const., art. I, § 1.)

The right encompasses privacy in one's sexual matters and is not limited to the marital relationship. (*Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 454-455 [31 L.Ed.2d 349, 362-364, 92 S.Ct. 1029].) Although the right to privacy is not absolute, it yields only to a compelling state interest. (*Fults* v. *Superior Court* (1979) 88 Cal.App.3d 899, 904 [152 Cal.Rptr. 210].) Here there was no compelling state interest to require the employer to investigate the sexual practices of its employee. Moreover, the employer who queries employees on sexual behavior is subject to claims for invasion of privacy and sexual harassment. (See *Coit Drapery Cleaners, Inc.* v. *Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1599-1600 [18 Cal.Rptr.2d 692].)

Similarly, Jane's contention the church should have required Omemaga to undergo a psychological evaluation before hiring him is unavailing. An individual's right to privacy also encompasses mental privacy. (*Kees* v. *Medical Board* (1992) 7 Cal.App.4th 1801, 1812-1813 [10 Cal.Rptr.2d 112].) We conclude the church did not fail to use due care in hiring Omemaga.

*Negligent Supervision*

Jane's claim the church negligently supervised Omemaga consists of generalized allegations she was "entrusted to his care" in the "spiritual environment" provided by the church. There are no specific allegations or facts the church somehow placed Jane in Omemaga's actual custody or control. Rather, the various police reports lodged by the church, without objection by Jane, indicate nearly all of the contact Jane had with Omemaga occurred when Omemaga took Jane from her home to various public places and hotels. Jane did not attend a church school, where an affirmative duty to protect students may exist. (See *Virginia G.* v. *ABC Unified School Dist.* (1993) 15 Cal.App.4th 1848, 1851 [19 Cal.Rptr.2d 671]; *Rodriguez* v. *Inglewood Unified School Dist.*, *supra*, 186 Cal.App.3d 707, 714-715.)

Jane theorizes the church has a duty to supervise priests because it places them in a unique position of trust and confidence and the vow of celibacy

"add[s] to their aura of spiritual power and authority, [under which] a child [parishioner] should suppose herself to be safe from sexual abuse." ■ The vow of celibacy by clergy is a religious decision based upon religious belief; it does not create a civil duty. Under the free exercise clause of the First Amendment, the state may not compel affirmation of a religious belief nor impose requirements based on belief in any religion. (*Torcaso* v. *Watkins* (1961) 367 U.S. 488, 495 [6 L.Ed.2d 982, 987, 81 S.Ct. 1680].) Thus the church had no greater civil duty based upon its religious tenets.

■ Similarly, there is no special relationship here creating a heightened duty of care based on a priest/parishioner relationship. In the context of a claim for negligent counseling, our Supreme Court explained in *Nally* v. *Grace Community Church, supra,* 47 Cal.3d 278, 298, that the Legislature has exempted clergy from licensing requirements applicable to other counselors. That exemption is in recognition "that access to the clergy for counseling should be free from state imposed counseling standards, and that 'the secular state is not equipped to ascertain the competence of counseling when performed by those affiliated with religious organizations.' [Citation.]" (*Ibid.*)

We conclude the church established no triable issue of material fact existed on the causes of action for negligent hiring and supervision and that it was entitled to summary judgment as a matter of law. (Code Civ. Proc. § 437c, subd. (o)(2); *Transamerica Occidental Life Ins. Co.* v. *State Bd. of Equalization* (1991) 232 Cal.App.3d 1048, 1053 [284 Cal.Rptr. 9].)

## DISPOSITION

Let a writ of mandate issue directing the superior court to vacate its order denying the motion for summary judgment and to enter a new order granting the motion. The stay issued on November 1, 1995, will vacate upon issuance of the remittitur.

Benke, Acting P. J., and Nares, J., concurred.