[No. B133742. Second Dist., Div. Five. Nov. 30, 2000.]

MARIA D., Plaintiff and Appellant, v.
WESTEC RESIDENTIAL SECURITY, INC., Defendant and Respondent.

128

**COUNSEL**

Jacobs, Jacobs & Rosenberg, Stanley K. Jacobs and Judi L. Jacobs for Plaintiff and Appellant.

Bradley & Gmelich, Barry A. Bradley and Frederick B. Hayes for Defendant and Respondent.

**OPINION**

**TURNER, P. J.—**

## I. INTRODUCTION

This case involves the potential respondeat superior liability of a private security company for an alleged sexual assault by an on-duty security guard.

Plaintiff, Maria D., appeals from a judgment in favor of defendant, Westec Residential Security, Inc. (Westec). The trial court summarily adjudicated that Westec could not be held vicariously liable for an alleged rape committed by one of its employees, an on-duty security guard. We agree that, as a matter of law, under *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 208-211, 213-222 [285 Cal.Rptr. 99, 814 P.2d 1341] (*Mary M.*), *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1003-1020 [47 Cal.Rptr.2d 478, 906 P.2d 440] (*Farmers*), and *Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 296-306 [48 Cal.Rptr.2d 510, 907 P.2d 358] (*Lisa M.*), Westec could not be held liable under the respondeat superior doctrine because the alleged rape was not within the scope of the security guard's employment. Accordingly, we affirm the judgment.[1]

## II. BACKGROUND

Plaintiff alleges she was raped by an on-duty Westec security guard in September 1997. Plaintiff filed the present action against Westec alleging causes of action for sexual assault and battery (first), false imprisonment (second), intentional infliction of emotional distress (third), and negligence (fourth). The trial court summarily adjudicated the first through third causes of action in Westec's favor. The trial court concluded: "[V]icarious liability cannot properly be imposed upon a private employer for acts and actions clearly not within the scope of employment . . . ." Plaintiff filed a writ petition. The petition was summarily denied. (*Maria D. v. Superior Court* (Apr. 12, 1999, B130735) [nonpub. opn.].) The case proceeded to trial of plaintiff's negligent hiring and retention claim. A jury found Westec had not been negligent in hiring, supervising, managing, controlling, or retaining the security guard as an employee. That finding is not at issue in this appeal.

---

[1]In her notice of appeal, plaintiff stated she was appealing from an order granting Westec's summary adjudication motion as to three causes of action and from the judgment after trial on a separate negligent hiring and retention claim. The appeal lies from the judgment. (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 128 [32 Cal.Rptr.2d 275, 876 P.2d 1074]; *Lackner v. LaCroix* (1979) 25 Cal.3d 747, 753 [159 Cal.Rptr. 693, 602 P.2d 393]; *Maryland Casualty Co. v. Andreini & Co.* (2000) 81 Cal.App.4th 1413, 1425 [97 Cal.Rptr.2d 752].) The only judgment in the record on appeal was one entered on the jury's special verdict as to plaintiff's fourth cause of action for negligence. There was no final judgment in the record disposing of the entire case. (See *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 304 [63 Cal.Rptr.2d 74, 935 P.2d 781]; *Rubin v. Western Mutual Ins. Co.* (1999) 71 Cal.App.4th 1539, 1546 [84 Cal.Rptr.2d 648].) However, we directed plaintiff's counsel to secure entry in the superior court of a judgment disposing of the entire case. We now treat the appeal as from that judgment. (Cal. Rules of Court, rule 2(c); see *Vibert v. Berger* (1966) 64 Cal.2d 65, 66-69 [48 Cal.Rptr. 886, 410 P.2d 390]; *LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 333-334, fn. 1 [60 Cal.Rptr.2d 539]; *Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115 [55 Cal.Rptr.2d 276].)

Plaintiff is a Swedish citizen residing in California. She testified at her deposition as follows. On September 4, 1997, at approximately 2 a.m., she was driving along Pacific Coast Highway. A Westec security guard detained her by shining a spotlight from his patrol car into her moving vehicle. He pulled up next to her and stopped. He asked, "How much have you been drinking tonight? What's going on?" Plaintiff thought the security guard was a police officer. The spotlight was shining in her face. The security guard got out of his car and asked plaintiff for her driver's license. He also asked: where she was coming from; where she had been before that; and where she worked. The security guard took the license back to his car and "wrote things down about it into his computer." The security guard then told plaintiff, "You can get out of the car now." He asked her whether she had "ever heard about a DUI before." He told her, "[R]ight now I could put you in jail for two years and I can get you deported." The security guard ordered plaintiff to perform field sobriety tests. He then told her to get her purse because he was going to take her "to the station." The security guard took plaintiff to another location where he raped her. Afterwards, he drove her back to her car. At the time of the encounter, the security guard was wearing a uniform, driving a Westec vehicle equipped with a spotlight, carried a gun and handcuffs on his belt, and had a second firearm on the front passenger seat of his car.

The security guard denied that he had pulled plaintiff over. He testified at his deposition that he saw her car on the side of the road and stopped to offer assistance. In the past he had assisted disabled motorists. The security guard denied ever having been reprimanded for doing so. He did not know of any other Westec security guard who had been reprimanded for doing so. He further testified, however, that in stopping to assist plaintiff he was "[p]robably not" acting within company policy.

Westec security guards were directed to limit their involvement to client-related incidents except in the event of a physically threatening situation. Westec's patrol manual stated in part: "Officers shall limit their involvement to Westec client related incidents only. The only exception is in the event an Officer observes a physically threatening incident, the Officer may intervene to prevent the incident from escalating to a life threatening situation. For public occurrences that do not involve the threat of physical harm the Officers' actions must be limited to observe and report the incident to the appropriate public agency." With respect to "minor non-injury road accidents" not involving a client, Westec security guards were directed to report the information to the radio dispatcher. Westec's policy manual stated: "As a general rule, you should not get involved in minor non-injury road accidents unless a client is involved. Such circumstances should be reported to the radio dispatcher so that the police can be advised."

Westec security guards were not authorized to make traffic stops. It was against Westec policy for a security guard to follow a car for any reason and to use a spotlight on a moving automobile. The present security guard had been disciplined in January 1997, eight months prior to incident at issue, for pulling a motorist over. In a "counseling review" report dated January 16, 1997, the security guard in the present case was advised in writing: "You are hereby reminded of Westec's policy that you are not to follow vehicles for any reason, nor should you ever use your spotlight or ally lights on a moving vehicle. The risk of shinning [*sic*] lights on moving vehicles could result in traffic accidents and can lead drivers to believe that they· are being pulled over by the police." Westec's patrol manual also prohibited its security guards from carrying "unauthorized passenger[s]" in Westec vehicles "at any time."

Westec security guards were not authorized to make drunk driving arrests. Westec security guards were authorized to make "private persons arrest[s]" (see Pen. Code, § 837) of individuals suspected of committing crimes against Westec clients but only as "a last resort." "Public arrests" were allowed "when there [was] no other reasonable alternative" because an arrestee represented "a threat to the physical safety to someone." Westec policy directed that: "[a]rrests should be confined to suspects who commit crimes against Westec or Westec clients or their property"; further, "[a]rrests are <u>not</u> to be made for crimes against the public where the best course of action would be to observe and report the crime to the local law enforcement agency"; moreover, "Westec Officers shall not make an arrest for driving under the influence but shall observe and report, without following the suspect."

Westec security guards were also given direction on how to deal with a suspicious person in a public area; i.e., not on a client's property. Westec's patrol manual stated: "a. Part of your work in preventing crime is to observe any suspicious persons you may come across in your patrol area. [¶] b. The extent to which you should become directly involved with suspicious persons in public areas depends upon the circumstances. [¶] c. The safest course of action is, from a distance, to record the description of a suspicious person (and their vehicle if they have one) on a Field Observation Card for future reference. If they are intending a criminal act, the fact that they see you observing and reporting in this manner will, in many cases, drive them from the area. If no direct contact is necessary, do not make any! [¶] d. While there is nothing preventing you from speaking to, and asking questions of, any person in a public area, such an approach must be done with a great deal of caution. In all such instances, you must ensure that your actions in no way implies [*sic*]: [¶] i. That you are a police [o]fficer. [¶] ii. That you are in

anyway delaying or detaining them. [¶] e. Such persons cannot be required to answer your questions or comply with your requests if you are not arresting them. Consequently, you must be prepared to back off if they refuse. You can also expect some abuse on occasions. [¶] f. In general: [¶] i. Avoid direct contact. Recording particulars on a Field Observation Card will suffice. [¶] ii. Don't approach if you have any indication of potential danger (e.g., group of suspicious persons). [¶] iii. If you do approach, use caution and adhere to safety precautions remembering points 'd' and 'e' above. [¶] iv. Be polite and helpful while being prepared to back off, if prudent to do so."

In a mission statement, Westec asked its security guards to: "1. Take the initiative to get things done. If it makes sense, do it! [¶] 2. Innovate! [¶] 3. Work for the common good! [¶] 4. Give nothing less than 100%! [¶] 5. Follow your heart!" In its job descriptions, Westec summarized security guards' responsibilities as including to "[m]aintain[] excellent and productive relationships with clients and with the general public toward an objective of creating high customer satisfaction and a positive public image of Westec's Patrol Division." Anne L. Laguzza testified at a deposition on behalf of Westec concerning its hiring and retention of the present security guard. Ms. Laguzza testified that Westec's policy, as expressed in its mission statement, was: "To be observant . . . of the community, in general. Not necessarily to protect them, but to be cognizant of [their] surroundings and of activities that may warrant some sort of assistance."

With respect to the use of force, Westec's patrol manual stated, "Force may only be used to repel an unlawful attack against you, a client, or other innocent person, or to overcome the unlawful resistance or threat of resistance by a suspect that is being lawfully arrested or is attempting to escape. [¶] The use of force by Westec Officers must always be reasonable and must cease once the resistance has been overcome. " Westec officers were authorized to draw or fire a firearm only to defend against deadly force.

## III. DISCUSSION

Plaintiff contends the trial court erred in summarily adjudicating, as a matter of law, that the security guard was acting outside the scope of his employment when, as she alleges, he detained and raped her. Plaintiff asserts that under *Mary M., supra,* 54 Cal.3d at pages 208-211, 213-222, whether the security guard was acting within the scope of his employment was a question of fact.

### A. *Standard of Review*

A summary adjudication motion is directed to the issues framed by the pleadings. (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54

Cal.App.4th 373, 385 [62 Cal.Rptr.2d 803]; *Lennar Northeast Partners v. Buice* (1996) 49 Cal.App.4th 1576, 1582 [57 Cal.Rptr.2d 435]; see *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 [32 Cal.Rptr.2d 223, 876 P.2d 1022]; *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207].) Code of Civil Procedure section 437c, subdivision (f)(1) provides: "A party may move for summary adjudication as to one or more causes of action within an action . . . if that party contends that the cause of action has no merit . . . . A motion for summary adjudication shall be granted only if it completely disposes of a cause of action . . . ." A moving party establishes that a cause of action has no merit "by negating an essential element or by establishing a complete defense. [Citations.]" (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 324 [82 Cal.Rptr.2d 649]; *City of Emeryville v. Superior Court* (1991) 2 Cal.App.4th 21, 23-25 [2 Cal.Rptr.2d 826].) As the Courts of Appeal have held, "A motion for summary adjudication proceeds in all procedural respects as a motion for summary judgment. [Citation.]" (*Toigo v. Town of Ross, supra,* 70 Cal.App.4th at p. 324; *Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 819 [44 Cal.Rptr.2d 56]; *Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1727 [22 Cal.Rptr.2d 781].) A defendant proves a claim has no merit if he or she establishes one or more of the elements of the cause of action cannot be separately established. (Code Civ. Proc., § 437c, subd. (n)(1); *Ochoa v. California State University* (1999) 72 Cal.App.4th 1300, 1304 [85 Cal.Rptr.2d 768].) The following is a moving defendant's burden of proof: "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists, but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (o)(2); see *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 72 [78 Cal.Rptr.2d 16, 960 P.2d 1046].) We review a trial court's decision to grant summary adjudication de novo. (*Nakamura v. Superior Court* (2000) 83 Cal.App.4th 825, 832 [100 Cal.Rptr.2d 97]; *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450 [75 Cal.Rptr.2d 54].)

B. *Mary M. and Cases Cited Therein*

The plaintiff in *Mary M.* was raped by an on-duty police officer. The Supreme Court held: "[W]hen . . . a police officer on duty misuses his

official authority by raping a woman whom he has detained, the public entity that employs him can be held vicariously liable. This does not mean that, as a matter of law, the public employer is vicariously liable whenever an on-duty officer commits a sexual assault. Rather, this is a question of fact for the jury. In this case, plaintiff presented evidence that would support the conclusion that the rape arose from misuse of official authority. Sergeant Schroyer detained plaintiff when he was on duty, in uniform, and armed. He accomplished the detention by activating the red lights on his patrol car. Taking advantage of his authority and control as a law enforcement officer, he ordered plaintiff into his car and transported her to her home, where he threw her on a couch. When plaintiff screamed, Sergeant Schroyer again resorted to his authority and control as a police officer by threatening to take her to jail. Based on these facts, the jury could reasonably conclude that Sergeant Schroyer was acting in the course of his employment when he sexually assaulted plaintiff." (*Mary M., supra,* 54 Cal.3d at p. 221, fn. omitted.)

■ In *Mary M.,* the Supreme Court explained the doctrine of respondeat superior as follows: "Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment. [Citation.] . . . The doctrine is a departure from the general tort principle that liability is based on fault. [Citation.] It is ' "a rule of policy, a deliberate allocation of a risk." ' [Citations.] Respondeat superior is based on ' "a deeply rooted sentiment" ' that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities. [Citations.] [¶] Recently, we articulated three reasons for applying the doctrine of respondeat superior: (1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury. [Citations.] [¶] For the doctrine of respondeat superior to apply, the plaintiff must prove that the employee's tortious conduct was committed within the scope of employment. [Citation.] 'A risk arises out of the employment when "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer. [Citation.]" ' [Citation.] [¶] Tortious conduct that violates an employee's official duties or disregards the employer's express orders may nonetheless be within the scope of employment. [Citations.] So may acts that do not benefit the employer [citation], or are willful or malicious in nature [citations]. [¶] The

doctrine of respondeat superior applies to public and private employers alike." (*Mary M., supra,* 54 Cal.3d at pp. 208-209; accord, *Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676].)

 In reaching its conclusion in *Mary M.,* the Supreme Court discussed and applied the three policies underlying the doctrine of respondeat superior, to wit: "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury. [Citations.]" (*Mary M., supra,* 54 Cal.3d at p. 209.) With respect to the first policy basis the court concluded: "[I]mposition of liability here would not be likely to cause public entities to take preventive measures that would impair the effectiveness of law enforcement activities. As the lead opinion in *John R.* said: 'We doubt that police departments would deprive their officers of weapons or preclude them from enforcing the laws . . . .' (*John R.* [*v. Oakland Unified School Dist.* (1989)] 48 Cal.3d [438,] 452 [258 Cal.Rptr. 948, 769 P.2d 948].) [¶] The imposition of liability on public entities whose law enforcement officers commit sexual assaults while on duty would encourage the employers to take preventive measures. There is little or no risk that preventive measures would significantly interfere with the ability of police departments to enforce the law and to protect society from criminal acts." (*Mary M., supra,* 54 Cal.3d at pp. 214-215, fn. omitted.)

As to the second policy reason underlying the application of respondeat superior—"to give greater assurance of compensation to the victim" (*Mary M., supra,* 54 Cal.3d at p. 215)—the Supreme Court held: "The Legislature has recognized that the imposition of vicarious liability on a public employer is an appropriate method to ensure that victims of police misconduct are compensated. It has done so by declining to grant immunity to public entities when their police officers engage in violent conduct. Since the enactment of the California Tort Claims Act in 1963 . . . , a governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct. [Citations.] The decisions cited have recognized, at least implicitly, that vicarious liability is an appropriate method to ensure that victims of police misconduct are compensated." (*Id.* at pp. 215-216, fn. omitted.)

Concerning the third policy consideration—"the appropriateness of spreading the risk of loss among the beneficiaries of the enterprise" (*Mary M., supra,* 54 Cal.3d at p. 216)—the Supreme Court stated: "[S]ociety has granted police officers extraordinary power and authority over its citizenry.

An officer who detains an individual is acting as the official representative of the state, with all of its coercive power. As visible symbols of that power, an officer is given a distinctively marked car, a uniform, a badge, and a gun. As one court commented, 'police officers [exercise] the most awesome and dangerous power that a democratic state possesses with respect to its residents—the power to use lawful force to arrest and detain them.' [Citation.] Inherent in this formidable power is the potential for abuse. The cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power." (*Id.* at pp. 216-217.)

The Supreme Court stressed that its conclusion in *Mary M.* "flows from the unique authority vested in police officers." (*Mary M., supra,* 54 Cal.3d at p. 218, fn. 11.) In response to the argument of the City of Los Angeles that the sergeant's conduct was so unusual it would be unfair to impose liability, the Supreme Court described the "unique authority" vested in police officers as follows: "[S]ociety has granted police officers great power and control over criminal suspects. Officers may detain such persons at gunpoint, place them in handcuffs, remove them from their residences, order them into police cars and, in some circumstances, may even use deadly force. The law permits police officers to ensure their own safety by frisking persons they have detained, thereby subjecting detainees to a form of nonconsensual touching ordinarily deemed highly offensive in our society. [Citation.] . . . . [¶] [T]he very nature of law enforcement employment requires exertion of physical control over persons whom an officer has detained or arrested. The authority to use force when necessary in securing compliance with the law is fundamental to a police officer's duties in maintaining the public order. [Citation.] That authority carries with it the risk of abuse. The danger that an officer will commit a sexual assault while on duty arises from the considerable authority and control inherent in the responsibilities of an officer in enforcing the law." (*Id.* at pp. 217-218.) The Supreme Court concluded: "In view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse that authority by engaging in assaultive conduct. . . . Sexual assaults by police officers are fortunately uncommon; nevertheless, the risk of such tortious conduct is broadly incidental to the enterprise of law enforcement, and thus liability for such acts may appropriately be imposed on the employing public entity." (*Ibid.,* fn. omitted.) The court emphasized that "[e]mployees who do not have this authority and who commit sexual assaults may be acting outside the scope of their employment as a matter of law. [Citation.]" (*Id.* at p. 218, fn. 11.)

The Supreme Court in *Mary M.* contrasted three cases in which the question whether an employee had acted within the scope of employment

was properly determined as a matter of law: "Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when 'the facts are undisputed and no conflicting inferences are possible.' [Citation.] In some cases, the relationship between an employee's work and wrongful conduct is so attenuated that a jury could not reasonably conclude that the act was within the scope of employment. (See, e.g., *John R.* [*v. Oakland Unified School Dist.*], *supra,* 48 Cal.3d at p. [452]; *Rita M. v. Roman Catholic Archbishop* (1986) 187 Cal.App.3d 1453, 1461 [232 Cal.Rptr. 685]; *Alma W. v. Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 139-140 [176 Cal.Rptr. 287].)" (*Mary M., supra,* 54 Cal.3d at p. 213.)

In *John R. v. Oakland Unified School Dist., supra,* 48 Cal.3d at pages 447-452, the Supreme Court concluded a school district could not be held vicariously liable for a teacher's sexual molestation of a student. The sexual misconduct was committed while the student was at the teacher's apartment participating in an officially sanctioned extracurricular program. (*Id.* at p. 441.) In reaching its conclusion, the Supreme Court relied on the "underlying rationale for the respondeat superior doctrine." (*Id.* at p. 450, fn. omitted.) The Supreme Court concluded, "Applying the doctrine of respondeat superior to impose, in effect, strict liability in this context would be far too likely to deter [school] districts from encouraging, or even authorizing, extracurricular and/or one-on-one contacts between teachers and students or to induce districts to impose such rigorous controls on activities of this nature that the educational process would be negatively affected." (*Id.* at p. 451, fn. omitted.) Additionally, the Supreme Court concluded exercising respondeat superior liability under the current circumstances would tend to make insurance hard to obtain and could divert needed funds from the classroom. (*Ibid.*) In addition, the Supreme Court held: "The only element of the analysis that might point in favor of vicarious liability here is the propriety of spreading the risk of loss among the beneficiaries of the enterprise. School districts and the community at large benefit from the authority placed in teachers to carry out the educational mission, and it can be argued that the consequences of an abuse of that authority should be shared on an equally broad basis. But the connection between the authority conferred on teachers to carry out their instructional duties and the abuse of that authority to indulge in personal, sexual misconduct is simply too attenuated to deem a sexual assault as falling within the range of risks allocable to a teacher's employer. It is not a cost this particular enterprise should bear, and the consequences of imposing liability are unacceptable." (*Id.* at pp. 451-452.)

Similarly, in *Alma W. v. Oakland Unified School Dist., supra,* 123 Cal.App.3d at pages 137-144, a decision cited repeatedly in *Mary M.,* the

Court of Appeal for the First Appellate District held as a matter of law a school district could not be held vicariously liable for a custodian's alleged sexual assault on a student. The Court of Appeal concluded there were no grounds for finding the assailant acted within the scope of his employment. The sexual assault was neither required nor incident to the custodian's duties, i.e., the connection between his duties and his wrongful act were too "attenuated." (*Id.* at pp. 139-140.) Our First District colleagues stated: "Sexual molestation is in no way related to mopping floors, cleaning rooms, or any of the other tasks that are required of a school custodian." (*Id.* at p. 140.) The Court of Appeal also held the sexual assault was not a reasonably foreseeable consequence of the educational enterprise and noted, "[I]t defies every notion of fairness to say that rape is characteristic of a school district's activities." (*Id.* at p. 142.)

The plaintiff in *Rita M. v. Roman Catholic Archbishop, supra,* 187 Cal.App.3d at page 1456, alleged seven priests of the Roman Catholic Church: entered into a conspiracy to have sexual intercourse with her; caused her to become pregnant; and secreted her off to the Philippines to have the baby, which resulted in her neglect, malnutrition, and illness. The Court of Appeal held: "Analytically, the question of whether a tort is committed within the course of employment turns on whether (1) the act performed was either required or instant to the employee's duties or (2) the employee's misconduct could be reasonably foreseen as an outgrowth of the employee's duties. [Citation.] [¶] Plaintiffs could not seriously contend that sexual relations with parishioners are either required by or instant to a priest's duties, so they are left with the foreseeability test. The question, however, is whether sexual relations between a parishioner and seven priests is foreseeable, not in an omniscient way, but in the relevant sense. [¶] . . . The foreseeable event must be characteristic of the activities of the enterprise. . . . It would defy every notion of logic and fairness to say that sexual activity between a priest and a parishioner is characteristic of the Archbishop of the Roman Catholic Church. There is simply no basis for imputing liability for the alleged conduct of the individual defendant-priests in this instance to the respondent Archbishop." (*Id.* at p. 1461.)

The Supreme Court in *Mary M.* also distinguished decisional authority relied on by the employer, the City of Los Angeles, involving sexual assaults by private security guards. The court cited *Heindel v. Bowery Savings Bank* (1988) 138 A.D.2d 787 [525 N.Y.S.2d 428], *Webb by Harris v. Jewel Companies, Inc.* (1985) 137 Ill.App.3d 1004 [92 Ill.Dec. 598, 485 N.E.2d 409], and *Rabon v. Guardsmark, Inc.* (4th Cir. 1978) 571 F.2d 1277. (*Mary M., supra,* 54 Cal.3d at p. 219.) The Supreme Court in *Mary M.* noted with respect to security guards, "Because such persons do not act as official

representatives of the state, any authority they have is different from, and far less than, that conferred upon an officer of the law." (*Ibid.*)

In *Heindel v. Bowery Savings Bank, supra,* 525 N.Y.S.2d at page 428, the Supreme Court of New York, Appellate Division, considered a case involving a sexual assault by a security guard on-duty in a shopping mall. The court ruled, "While an employer can be held vicariously liable for the torts of his employee committed in the course of the employer's work, even if the acts are done irregularly or with disregard of instruction [citation], there is no respondeat superior liability for torts committed by the employee for personal motives unrelated to the furtherance of the employer's business [citation]." (*Ibid.*) The New York court concluded: "Here, [the guard's] outrageous conduct was in no way incidental to the furtherance of [the employer's] interest. The acts were committed for personal motives and were a complete departure from the normal duties of a security guard." (*Id.* at pp. 428-429.)

Similarly, in *Webb by Harris v. Jewel Companies, Inc., supra,* 485 N.E.2d at pages 411-413, the Appellate Court of Illinois held as a matter of law a supermarket company was not vicariously liable for an on-duty security guard's sexual molestation of a customer. The court stated the following rule: "Under the doctrine of respondeat superior, an employer may be liable for the negligent, willful, malicious or even criminal acts of its employees when such acts are committed in the course of employment and in furtherance of the business of the employer; however, the employer is not liable to an injured third party where the acts complained of thereby were committed solely for the benefit of the employee. [Citations.]" (*Id.* at p. 411, italics omitted.) The Illinois court concluded, "[T]he sexual molestation of a young girl by a security guard is . . . a deviation having no relation to the business of [the employer] or the furtherance thereof." (*Id.* at pp. 412-413.)

The plaintiff in *Rabon v. Guardsmark, Inc., supra,* 571 F.2d at pages 1278-1279, was raped at gunpoint by an on-duty security guard in an office building. The United States Court of Appeals for the Fourth Circuit, applying South Carolina law, held as a matter of law: "[U]nder the doctrine of respondeat superior, as traditionally applied in South Carolina, Guardsmark was not liable for [the guard's] intentional tort. [Citations.] The assault by [the guard] was manifestly not in furtherance of Guardsmark's business; it was the converse of Guardsmark's purpose that of providing protection and that for which it was employed. The assault was to effect [the guard's] independent purpose, and it was not within the scope of his employment." (*Id.* at p. 1279.)

As plaintiff correctly notes, all three of the foregoing out-of-state cases relied on the rule that an employer is not liable for acts unrelated to the

furtherance of the employer's interests. California has rejected that rule as a singular test of respondeat superior liability. (*Lisa M., supra,* 12 Cal.4th at p. 297; *Fields v. Sanders* (1947) 29 Cal.2d 834, 839 [180 P.2d 684, 172 A.L.R. 525].) In addition, none of those cases involved a security guard who, like the one in the present case, patrolled the community in a marked vehicle, wearing a uniform, and carrying a weapon. As Westec itself recognized, "[T]he mere presence of an armed uniformed [Westec] Officer may cause others to believe that they are under arrest." The security guards whose conduct was at issue in the three out-of-state cases were on duty in a shopping mall, a supermarket, and an office building. Nevertheless, as further discussed below, the Supreme Court has expressly limited its holding in *Mary M.* to sexual assaults by publicly employed law enforcement officers. (*Mary M., supra,* 54 Cal.3d at p. 218, fn. 11; *Farmers, supra,* 11 Cal.4th at p. 1012; *Lisa M., supra,* 12 Cal.4th at p. 304.) Division Two of the Court of Appeal for this appellate district has declined to extend *Mary M. (Thorn v. City of Glendale* (1994) 28 Cal.App.4th 1379, 1384 [35 Cal.Rptr.2d 1] [city fire marshal committed arson].) The Supreme Court's decision in *Mary M.* turned on the "extraordinary," " 'awesome and dangerous,' " "formidable," "great," "considerable," and "unique" power and authority vested in police officers by the public. (*Mary M., supra,* 54 Cal.3d at pp. 216-218 & fn. 11; *Thorn v. City of Glendale, supra,* 28 Cal.App.4th at p. 1384 ["our Supreme Court appears to have established a special rule for the independent wrongful acts of police officers based upon their unique position of both trust and power in our society"].) There was evidence the police officer in *Mary M.* relied on and took advantage of that actual authority in committing the sexual assault. (*Mary M., supra,* 54 Cal.3d at p. 219.) The Supreme Court held a trier of fact could reasonably conclude the rape arose from a misuse of that official authority. (*Id.* at p. 221.) In contrast, in this case, none of the security guard's alleged acts were authorized by Westec, let alone by the state. As defendant summarizes, "[The security guard] was not supposed to shine his car's spotlight on the plaintiff, he was not supposed to pull her over, he was not supposed to demand identification from her, or interrogate her. He was not supposed to order her to exit her vehicle or perform a field sobriety test on her. He was not supposed to place her under arrest or into his car. And, of course, he was not supposed to kidnap and rape her."

## C. *Farmers Insurance Group*

The Supreme Court revisited respondeat superior liability in *Farmers, supra,* 11 Cal.4th at pages 1003-1020. *Farmers* was an action for indemnification brought by a male deputy sheriff who had sexually harassed female deputies at a county jail. The deputy sheriff sought indemnification from his employer, the County of Santa Clara, for his costs for defending against a

sexual harassment lawsuit. The county could be required to indemnify the deputy sheriff only if he established that the sexual harassment was in the scope of his employment. (*Id.* at p. 997.) The Supreme Court explained the "scope of employment" rule as follows: "[A]n employer is not strictly liable for all actions of its employees during working hours. Significantly, an employer will not be held vicariously liable for an employee's malicious or tortious conduct if the employee *substantially* deviates from the employment duties for personal purposes. [Citations.] Thus, if the employee 'inflicts an injury out of personal malice, not engendered by the employment' [citation] or acts out of 'personal malice unconnected with the employment' [citation], or if the misconduct is not an 'outgrowth' of the employment [citation], the employee is not acting within the scope of employment. Stated another way, '[i]f an employee's tort is personal in nature, mere presence at the place of employment and attendance to occupational duties prior or subsequent to the offense will not give rise to a cause of action against the employer under the doctrine of respondeat superior.' [Citation.] In such cases, the losses do not foreseeably result from the conduct of the employer's enterprise and so are not fairly attributable to the employer as a cost of doing business." (*Id.* at pp. 1004-1005.)

The Supreme Court in *Farmers* reviewed and summarized decisional authority on respondeat superior liability. The court found: "[A]n employer may be subject to vicarious liability for injuries caused by an employee's tortious actions resulting or arising from pursuit of the employer's interests. [Citations.] Vicarious liability may also be proper where the tortious conduct results or arises from a dispute over the performance of an employee's duties, even though the conduct is not intended to benefit the employer or to further the employer's interests. [Citations.] Vicarious liability may even be appropriate for injuries caused *after work hours* where a dispute arises over the rights and privileges of off-duty employees. [Citation.] In these types of situations, the tortious actions are engendered by events or conditions relating to the employment and therefore are properly allocable to the employer. [¶] Conversely, vicarious liability is deemed inappropriate where the misconduct does not arise from the conduct of the employer's enterprise but instead arises out of a personal dispute [citations]. In such cases, the risks are engendered by events unrelated to the employment, so the mere fact that an employee has an opportunity to abuse facilities or authority necessary to the performance of his or her duties does not render the employer vicariously liable. [Citation.] [¶] In a context more analogous to this case, several decisions have addressed whether an employee's sexual misconduct directed toward a third party is within the scope of employment for respondeat superior purposes. Those cases hold that, except where sexual misconduct by on-duty police officers against members of the public is involved [citation],

the employer is not vicariously liable to the third party for such misconduct [citations]. In those decisions, vicarious liability was rejected as a matter of law because it could not be demonstrated that the various acts of sexual misconduct arose from the conduct of the respective enterprises. In particular, the acts had been undertaken solely for the employees' personal gratification and had no purpose connected to the employment. Moreover, the acts had not been engendered by events or conditions relating to any employment duties or tasks; nor had they been necessary to the employees' comfort, convenience, health, or welfare while at work." (*Farmers, supra,* 11 Cal.4th at pp. 1005-1007.)

In *Farmers,* the Supreme Court concluded as a matter of law the deputy sheriff was not acting within the scope of his employment when he sexually harassed his coworkers. His motivation was strictly personal and "unrelated to the guarding of inmates or the performance of any other duty of a deputy sheriff at a county jail." (*Farmers, supra,* 11 Cal.4th at p. 1007.) The misconduct was not "precipitated by a work-related dispute . . . ." (*Ibid.*) The misbehavior had nothing to do with the deputy sheriff's work or that of his victims. (*Id.* at p. 1008.) The Supreme Court held: "Even if the evidence shows that the use of profanity and sexually explicit language was not uncommon at this particular county jail, it still falls far short of establishing that serious misconduct such as asking individual employees for sexual favors and targeting those individuals for inappropriate touching is either typical of or broadly incidental to the operation of a county jail or to the duties and tasks of deputy sheriffs at such a jail. (See *Perez* [*v. Van Groningen & Sons Inc.*], *supra,* 41 Cal.3d at p. 968; *Hinman* v. *Westinghouse Elec. Co.* [(1970)] 2 Cal.3d [956,] 960 [88 Cal.Rptr. 188, 471 P.2d 988].) [¶] Moreover, factors that might be relevant to whether the County itself acted negligently are not relevant to whether the County should be vicariously liable for an employee's misconduct regardless of its own fault. (*John R.* [*v. Oakland Unified School Dist.*], *supra,* 48 Cal.3d at p. 450, fn. 9; see also 48 Cal.3d at p. 451, fn. 10; *Hinman* v. *Westinghouse Elec. Co., supra,* 2 Cal.3d at p. 960 [in making respondeat superior determination, ' "we are not looking for that which can and should reasonably be avoided, but [for] the more or less inevitable toll of a lawful enterprise" '].)" (*Farmers, supra,* 11 Cal.4th at p. 1011.)

D. *Lisa M.*

The Supreme Court further clarified the circumstances under which an employer may be vicariously liable for an employee's intentional tort in

*Lisa M.* The plaintiff in *Lisa M.* was sexually molested by an ultrasound technician employed by a hospital. (*Lisa M., supra,* 12 Cal.4th at p. 294.) The Supreme Court considered the following question: "What . . . is the connection required between an employee's intentional tort and his or her work so that the employer may be held vicariously liable?" (*Id.* at p. 297.) The Supreme Court began its analysis by identifying a rule of law California does not follow. ▮ The Supreme Court noted: "It is clear, first of all, that California no longer follows the traditional rule that an employee's actions are within the scope of employment only if motivated, in whole or part, by a desire to serve the employer's interests. (See Rest.2d Agency, § 228, subd. 1(c) [conduct must be 'actuated, at least in part, by a purpose to serve the master'].)" (*Lisa M., supra,* 12 Cal.4th at p. 297.) Nevertheless, the assault or other intentional tort must have "a causal nexus" to the employee's work. (*Ibid.*) The Supreme Court noted an employee's motive remains relevant when it held, "An act serving only the employee's personal interest is less likely to arise from or be engendered by the employment than an act that, even if misguided, was intended to serve the employer in some way." (*Id.* at p. 298.) In the Supreme Court's view, the required causal nexus was to be distinguished from "but for" causation and it was not enough that the employment brought the tortfeasor and the victim together. The nature of the required additional link has been described in various ways: "[T]he incident leading to injury must be an 'outgrowth' of the employment [citation]; the risk of tortious injury must be ' "inherent in the working environment" ' [citation] or ' "typical of or broadly incidental to the enterprise [the employer] has undertaken" ' [citation]." (*Ibid.*)

In addition, the Supreme Court explained in *Lisa M.,* ". . . California courts have also asked whether the tort was, in a general way, foreseeable from the employee's duties. Respondeat superior liability should apply only to the types of injuries that ' "as a practical matter are sure to occur in the conduct of the employer's enterprise." ' (*Hinman* v. *Westinghouse Elec. Co., supra,* 2 Cal.3d at p. 959.) The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." (*Lisa M., supra,* 12 Cal.4th at p. 299.) The Supreme Court continued: "[T]he tortious occurrence must be 'a generally foreseeable consequence of the activity.' In this usage . . . foreseeability 'merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' [Citations.] [This] foreseeability test is useful 'because it reflects the central justification for respondeat superior [liability]: that losses fairly attributable to an enterprise—those which foreseeably result from the conduct of the enterprise—should be allocated to the enterprise as a cost of doing business.' [Citation.]" (*Ibid.*)

In *Lisa M.,* the Supreme Court first considered whether there was a causal nexus between the tort committed and the employee's work. The court found the sexual assault was causally related to the ultrasound technician's employment in the "but for" sense; the assault would not have occurred had the technician not been so employed. The technician's employment provided the opportunity for him to meet the plaintiff and to be alone with her, making the assault possible. But the technician's acts were not engendered by or an outgrowth of his employment. (*Id.* at pp. 300-302.) The Supreme Court noted: "[A] sexual tort will not be considered engendered by the employment unless its motivating emotions were fairly attributable to work-related events or conditions. Here the opposite was true: a technician simply took advantage of solitude with a naive patient to commit an assault for reasons unrelated to his work." (*Id.* at p. 301.) The technician's decision to engage in conscious exploitation of the patient did not arise out of the performance of the examination, although the circumstances of the examination made it possible. The Supreme Court held: " 'If . . . the assault was not motivated or triggered off by anything in the employment activity but was the result of only propinquity and lust, there should be no liability.' (*Lyon* v. *Carey* (D.C. Cir. 1976) 533 F.2d 649, 655 . . . .)" (*Lisa M., supra,* 12 Cal.4th at p. 301.) The Supreme Court concluded: "[The technician's] motivating emotions were not causally attributable to his employment. The flaw in plaintiff's case for Hospital's respondeat superior liability is not so much that [the technician's] actions were personally motivated, but that those personal motivations were not generated by or an outgrowth of workplace responsibilities, conditions or events." (*Id.* at pp. 301-302.)

The Supreme Court in *Lisa M.* also analyzed the facts in terms of foreseeability. The Supreme Court found the technician's misconduct was not foreseeable and held: "An intentional tort is foreseeable, for purposes of respondeat superior, only if '*in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' [Citation.] The question is not one of statistical frequency, but of a relationship between the nature of the work involved and the type of tort committed. The employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." (*Lisa M., supra,* 12 Cal.4th at p. 302.) The Supreme Court held: "In cases like the present one, a deliberate sexual assault is fairly attributed not to any peculiar aspect of the health care enterprise, but only to 'propinquity and lust' [citation]." (*Ibid.,* fn. omitted.) The Supreme Court concluded: "The assault, rather, was the independent product of [the technician's] aberrant decision to engage in conduct unrelated to his duties. In the pertinent sense, therefore, [his] actions were not foreseeable from the nature of the work he was employed to perform." (*Id.* at p. 303.)

The *Lisa M.* court distinguished *Mary M.* as follows: ". . . *Mary M.* . . . provides less than compelling precedent for liability here. In *Mary M.,* we held a police officer's assault was a generally foreseeable consequence of his position. 'In view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse that authority by engaging in assaultive conduct.' [Citation.] We expressly limited our holding: 'We stress that our conclusion in this case flows from the unique authority vested in police officers. Employees who do not have this authority and who commit sexual assaults may be acting outside the scope of their employment as a matter of law.' [Citation.] [¶] While a police officer's assault may be foreseeable from the scope of his unique authority over detainees, we are unable to say the same of an ultrasound technician's assault on a patient. Hospital did not give [the technician] any power to exercise general control over plaintiff's liberty. He was not vested with any coercive authority, and the trust plaintiff was asked to place in him was limited to conduct of an ultrasound examination. His subsequent battery of the patient was independent of the narrow purpose for which plaintiff was asked to trust him. Whatever costs may be fairly attributable to a police officer's public employer in light of the extraordinary scope of authority the community, for its own benefit, confers on the officer, we believe it would not be fair to attribute to Hospital, which employed [the technician] simply to conduct ultrasound examinations, the costs of a deliberate, independently motivated sexual battery unconnected to the prescribed examination." (*Lisa M., supra,* 12 Cal.4th at pp. 303-304.)

The Supreme Court in *Lisa M.* also considered the policy goals of the respondeat superior doctrine: "[P]reventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably . . . ." (*Lisa M., supra,* 12 Cal.4th at p. 304.) The Supreme Court found the first two policy considerations of uncertain import. With respect to the third policy concern, the court concluded: "[T]he connection between [the technician's] employment duties . . . and his independent commission of a deliberate sexual assault was too attenuated, without proof of Hospital's negligence, to support allocation of plaintiff's losses to Hospital as a cost of doing business." (*Id.* at p. 305.)

E. *Application to the Present Case*

Plaintiff claims she was driving along a public road when she was stopped, detained, and raped by a Westec security guard. The security guard denied that he stopped, detained, or raped plaintiff. Westec established that, even accepting as true plaintiff's version of the events, it could not, as a matter of law, be held vicariously liable for the assault on a respondeat

superior theory. Plaintiff has not raised any triable issue as to whether the sexual assault was within the scope of the security guard's employment.

Imposition of vicarious liability on Westec does not follow from and cannot be premised on *Mary M.* The Supreme Court made it clear that *Mary M.* was limited to its facts—an intentional assault by an on-duty publicly employed police officer. (*Mary M., supra,* 54 Cal.3d at p. 218, fn. 11.) The intent to limit the *Mary M.* holding was reiterated in *Farmers, supra,* 11 Cal.4th at page 1012, and *Lisa M., supra,* 12 Cal.4th at page 304. The decision in *Mary M.* turned on the "extraordinary," " 'awesome and dangerous,' " "formidable," "great," "considerable," and "unique" power and authority vested in police officers by the public. (*Mary M., supra,* 54 Cal.3d at pp. 216-218 & fn. 11.) The Supreme Court held there was a triable issue whether in committing the rape the sergeant resorted to his authority and control as a law enforcement officer. (*Id.* at p. 221.) The Supreme Court distinguished the case both generally, from those involving "[e]mployees who do not have this authority" (*Mary M., supra,* 54 Cal.3d at p. 218, fn. 11) and specifically from those involving private security guards who "do not act as official representatives of the state," and whose authority "is different from, and far less than, that conferred upon an officer of the law." (*Id.* at p. 219.) The assault on plaintiff did not arise from misuse of the unique official authority conferred on a public law enforcement officer. The security guard was not acting as an official representative of the state at the time of the assault. Therefore, *Mary M.* does not control the outcome of this case. (Accord, *Thorn v. City of Glendale, supra,* 28 Cal.App.4th at p. 1384.)

Further, we conclude that the causal nexus between the sexual assault and the security guard's employment was too attenuated for a trier of fact to conclude that the misconduct was within the scope of his employment. Given plaintiff's description of the events, a trier of fact could reasonably conclude that the assault would not have occurred but for the security guard's employment with Westec. That he was driving a marked patrol car with a spotlight, wearing a uniform, and carrying a gun all contributed to providing the opportunity for the security guard to assault plaintiff. But the mere fact the security guard had an opportunity to abuse the trappings of his profession does not render Westec vicariously liable for the rape. (*Lisa M., supra,* 12 Cal.4th at pp. 298, 299-300; *Farmers, supra,* 11 Cal.4th at p. 1006.) As the Supreme Court stated in *Lisa M.,* "That the employment brought tortfeasor and victim together in time and place is not enough." (*Lisa M., supra,* 12 Cal.4th at p. 298.) For respondeat superior liability to apply, the security guard's acts must have been engendered by or be an outgrowth of his employment. (*Id.* at pp. 298, 301-302; *Farmers, supra,* 11 Cal.4th at pp. 1004-1005.) Here, the security guard's motivating emotions

were not fairly attributable to any work-related event or condition. (*Lisa M., supra,* 12 Cal.4th at p. 301.) There was no work-related dispute or emotional involvement with plaintiff that motivated or triggered the sexual assault. (*Lisa M., supra,* 12 Cal.4th at p. 301; *Farmers, supra,* 11 Cal.4th at pp. 1005-1007.) The security guard's aberrant decision to assault plaintiff did not arise out of the performance of his duties as a private security guard. (*Farmers, supra,* 11 Cal.4th at pp. 1006-1008.) His motivation was strictly personal and unrelated to the protection of Westec's clients' persons and property or the performance of any other duty of a security guard. (*Ibid.*) The security guard simply took advantage of a woman driving alone in the early morning hours to commit an assault for reasons unrelated to his work. (*Lisa M., supra,* 12 Cal.4th at p. 301.) The sexual assault was not typical of nor broadly incidental to the security guard's employment duties. (*Farmers, supra,* 11 Cal.4th at p. 1011.) The security guard substantially deviated from his employment duties solely for personal purposes. (*Lisa M., supra,* 12 Cal.4th at p. 301; *Farmers, supra,* 11 Cal.4th at pp. 1004-1005.) The assault was not motivated or triggered by anything in the employment activity but was the result of only, in the words of the Supreme Court, " 'propinquity and lust.' " (*Lisa M., supra,* 12 Cal.4th at p. 301.)

Nor was the security guard's misconduct foreseeable from the nature of his duties for purposes of potential respondeat superior liability. Unlike a public law enforcement officer, the security guard was not vested with considerable authority and control over citizens. The security guard was not authorized to pull plaintiff over, conduct field sobriety tests, or order her into his automobile. The security guard's sexual assault of plaintiff was not fairly attributable to any peculiar aspect of Westec's business operations. It was the independent product of his aberrant decision to engage in conduct unrelated to his duties. (*Lisa M., supra,* 12 Cal.4th at p. 303.) The nature of the work involved, protection of Westec's clients' persons and property, does not predictably create a risk employees will impersonate police officers, and stop, detain, and rape individuals driving on the public streets. (*Lisa M., supra,* 12 Cal.4th at pp. 302-303; *Farmers, supra,* 11 Cal.4th at pp. 1003-1004.)

It is uncertain whether the policy goals "to prevent recurrence of the tortious conduct" and "to give greater assurance of compensation for the victim" (*Mary M., supra,* 54 Cal.3d at p. 209) weigh in favor or against applying the doctrine of respondeat superior under the present circumstances. A good argument might be made that imposition of respondeat superior liability on Westec would not cause it to take preventive measures that would impair the effectiveness of its client protection activities. (See *Mary M., supra,* 54 Cal.3d at pp. 214-215.) On the other hand, imposition of

liability on Westec might cause it to take measures that would undermine the effectiveness of its personnel. However, no evidence bearing on this question was presented in the trial court. Further, because the security guard was not acting in the scope of his employment when he assaulted plaintiff, existing tort law does not sanction the imposition of vicarious liability on Westec as an appropriate method to ensure that assault victims are compensated. Moreover, the connection between the security guard's employment duties and his independent commission of a deliberate sexual assault was too attenuated to support allocation of plaintiff's losses to Westec as a cost of doing business. (*Lisa M., supra,* 12 Cal.4th at p. 305.)

Plaintiff contends the *Mary M.* reasoning should be extended to Westec security guards because: they project the authority of police officers; they patrol communities in marked vehicles, wearing uniforms, and carrying firearms; they are authorized by their employer to make a private persons arrest (see Pen. Code, § 837) and to use deadly force in certain circumstances; further, this projected authority serves the employer's profit-making purposes. Plaintiff's characterization of the Westec aura is superficially persuasive. But a significant difference between the police officer in *Mary M.* and the security guard here remains. The security guard's actual authority is not comparable to that of a police officer. A police officer's actual power and authority are significantly greater both in degree and kind. It was this actual power and authority, coupled with the fact that a police officer acts as a representative of the state, that led the Supreme Court in *Mary M.* to conclude that a sergeant's sexually assaultive conduct toward a member of the public could be found to be within the scope of his employment.

In her reply brief plaintiff contends that with the exception of the rape, all of the security guard's actions were "arguably . . . in accord with the [Westec] parameters for officer conduct . . . ." The record before us is to the contrary. Westec directed its security guards to limit their involvement to client related incidents except in the case of a physically threatening situation. Westec personnel were not authorized to: follow a vehicle for any reason; use a spotlight on a moving car; detain or interrogate a member of the public; conduct field sobriety tests; make an arrest for driving under the influence; make an arrest for a crime against the public absent a threat to physical safety; or carry unauthorized passengers in Westec vehicles. In short, *none* of the conduct plaintiff testified to was authorized by Westec.

Plaintiff's counsel asserted at oral argument that: a trier of fact could reasonably infer Westec security guards were authorized "to render public assistance"; Westec had directed its security guards to follow their hearts, be aware of their surroundings, and offer assistance to nonclients; and once the

security guard made initial contact with plaintiff within the scope of his employment, everything that followed afterward remained in the scope of employment. Plaintiff's argument rests on a partial acceptance of the security guard's version of the events—that he stopped to offer assistance to plaintiff whose car was on the side of the road—and a rejection in part of plaintiff's testimony—that the security guard pulled her over by shining a spotlight into her moving vehicle. We conclude even if a trier of fact were to find plaintiff was stopped on the side of the road when the security guard first encountered her and he acted within the scope of his employment by inquiring whether she needed assistance, there still would be no basis for a reasonable conclusion the sexual assault was within the scope of his employment. To hold Westec vicariously liable, a trier of fact would have to further find that the security guard subsequently detained and raped plaintiff. As discussed above, those actions as a matter of law were outside the scope of his employment.

Further, if the trier of fact accepted the security guard's version of what occurred at the inception of the incident, that he stopped to render roadside assistance, but rejected his claim no violent sexual assault occurred, plaintiff would still be unable to prevail given the holding in *Lisa M.* If the security guard stopped to render assistance pursuant to Westec's policies, its status as the employer was similar to the hospital in *Lisa M.* As in *Lisa M.*, the "motivating emotions were [not] fairly attributable to work-related events." (*Lisa M., supra,* 12 Cal.4th at p. 301.) Plaintiff can only point to the fact that Westec's policies under her hypothetical scenario, one she denied ever happened, brought the security guard together with her which is insufficient to support a respondeat superior theory in a sexual assault case under these circumstances.

Two final observations are in order. First, a person in plaintiff's position retains significant legal remedies against an employer of a security guard who engages in misconduct of the type involved in this case. The employer remains potentially liable to a victim of sexual assault for negligent hiring, retention, and supervision of a security guard. (*Roman Catholic Bishop v. Superior Court* (1996) 42 Cal.App.4th 1556, 1564-1565 [50 Cal.Rptr.2d 399]; *Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 842-843 [10 Cal.Rptr.2d 748]; Rest.2d Agency § 213, com. d, p. 459 ["The principal may be negligent because he has reason to know that the servant or other agent, because of his qualities, is likely to harm others in view of the work or instrumentalities entrusted to him. If the dangerous quality of the agent causes harm, the principal may be liable under the rule

that one initiating conduct having an undue tendency to cause harm is liable therefor."].) In this case, that issue was tried to the jury. The jurors found Westec was not liable. Also, the assailant remains civilly liable to the victim. Nothing we have said in this opinion should be construed to mean the victim of a sexual assault may not secure financial compensation in California courts from businesses which *negligently* hire and place in positions of responsibility dangerous sex offenders. In the face of negligent hiring, retention, or supervision and the like, California businesses, including security guard providers, remain potentially liable to sexual assault victims under such circumstances. The jury found this was not such a case and plaintiff has not challenged the verdict on appeal.

Second, this case involves a security company with extensive written policies covering the conduct at issue. Westec's comprehensive written policies prohibit not only sexual assault but the manner in which the security guard came into contact with plaintiff. We do not address a situation where a security services provider has no policies or they do not address the manner in which an employee comes into contact with a sexual assault victim. Different respondeat superior considerations may be present in such a case. Our point is that in this case, the security guard came into contact with plaintiff utilizing conduct which was entirely violative of Westec's written policies. The parties have raised no issue of a possible scenario where written policies are in place but they are not enforced. We do not address those factual situations which are materially different from the present case.

## IV. DISPOSITION

The judgment is affirmed. Defendant, Westec Residential Security, Inc., is to recover its costs on appeal from plaintiff, Maria D.

Armstrong, J., concurred.

**GRIGNON, J.**—I concur in the judgment. I also concur in the majority opinion with the exception of the final two paragraphs, the "two final observations." In my view, the first observation is gratuitous and unnecessary. Plaintiff tried her negligent hiring and retention cause of action to a jury and lost. The issue of the security guard's liability is not before us.

As to the second observation, it is pure dicta. We have been presented with a factual scenario in which the employer adopted and enforced written

policies. We need not speculate for future cases as to what the result might be in the absence of written policies or upon the failure to enforce written policies.

On December 20, 2000, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 21, 2001. Mosk, J., and Werdegar, J., were of the opinion that the petition should be granted.